JIM ZEGEER AND EMILY R. ZEGEER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zegeer v. Commissioner
Docket Nos. 12509-80; 17041-81; 16585-85.[1]
United States Tax Court
T.C. Memo 1987-590; 1987 Tax Ct. Memo LEXIS 589; 54 T.C.M. (CCH) 1203; T.C.M. (RIA) 87590; November 30, 1987; As amended November 30, 1987 Morton S. Taubman and Daniel P. Hodin, for the petitioners. Cynthia J. Mattson, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Additions to Tax
Docket No.
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
12509-80
1976
$ 5,676.00
--
--
17041-81
1977
319.32
--
--
16585-85
1981
6,659.00
$ 333
50% of interest
on $ 6,659.00
The issue for decision is whether the Boone County Coal Properties partnership is entitled to various deductions with respect to its mining activities, and in turn, whether petitioners are entitled to their distributive share of such deductions. Some of the facts have been stipulated and are so found. This reference incorporates the stipulation of facts and attached exhibits. For reasons of convenience, we have combined our findings of fact and opinion. Petitioners resided in Alexandria, *592 Virginia, at the time they filed their petitions. They timely filed joint Federal income tax returns on a cash basis for the 1976, 1977 and 1981 taxable years. In the summer of 1974, George Neilan ("Neilan"), a patent attorney, was approached by a mining engineer client regarding the disposition of certain coal property in West Virginia. While in West Virginia on behalf of his client, Neilan became aware of another tract of land, constituting approximately 1,420 acres, which was available for sale. Neilan expressed interest in purchasing the tract, provided that what he considered adequate coal reserves existed on the land. However, there was no existing coal reserve estimate on the tract, so upon his return from West Virginia, Neilan engaged the services of Wilfred Lunding ("Lunding"), a geology Ph.D. candidate at George Washington University, to prospect the land. Although Lunking had no prior working experience with respect to estimating coal reserves, he prepared a geological report, dated February, 1975, on the 1,420-acre tract for Neilan. At some point subsequent to Neilan's initial contact with Lunding, Neilan's fee for service arrangement with Lunding evolved into *593 a partnership relationship and Neilan and Lunking formed L & N Associates. In February, 1975, Neilan hired the firm of Robinson and Robinson, a division of NUS Corporation, as a coal mining consultant. Neilan and Lunking dealt primarily with Ernest D. Conaway ("Conaway"), chief engineer of mine development for Robinson and Robinson. Neilan furnished Conaway with the Lunking report. In February, 1976, Conaway provided Neilan with a report of the estimated recoverable coal reserves on the 1,420-acre tract. Conaway calculated the reserves in three seams, the Cedar Grove, Alma and Peerless. Neilan and Lunking were looking for a third party to provide financial backing for the mining of the coal. They were flexible as to the structure of the financing and had been considering the possibilities of leasing the coal for a percentage or entering into a joint venture to syndicate it. In June, 1976, Neilan met with Mark Jones ("Jones"), an investment banker, in Jones' office in New York. Jones represented to Neilan that he was looking for coal properties to develop. With respect to the transaction involved herein, Jones was introduced to Jay Landesman ("Landesman"), a New York attorney, *594 investor and financial consultant, through a mutual friend and business associate of Lanesman, Douglas Palermo ("Palermo"). Neilan, in turn, met Landesman in July, 1976. During the summer of 1976, Jones and Landesman each visited the 1,420-acre tract with Neilan. As of 1976, neither Jones, Palermo nor Landesman had any experience in operating a coal mine. Landesman and Jones reviewed the Conaway report, and Landesman met with Conaway during the summer of 1976. During that summer, Jones contacted the West Virginia engineering firm of J. W. Miller and Associates. Landesman also met with Messrs. Miller and Laird of J. W. Miller and Associates ("Miller") to discuss the project. In July, 1976, Jones and Neilan entered into a letter of intent (dated July 21, 1976) written by Jones. Jones proposed to sell, on a best-effort basis, limited partnership interests enabling him to lease from Neilan and his associates (presumably L & N Associates) the Peerless seam on a royalty basis. Jones would in turn sublease the seam to the limited partnership. The letter also provided that Neilan was to arrange for the mining, and obtain a contract, or purchase order, for the sale of not less *595 than 100,000 tons per year, at a minimum contract price of $ 26 per ton delivered. Between July 21, 1976 and August 3, 1976, a deed dated April 1, 1976 was executed by various parties, granting to Neilan the coal in place and underlying three great tracts of land in Boone County and Logan County, West Virginia. The deed was filed in the Boone County Commission Clerk's Office on October 13, 1976. Under the terms of the deed, Neilan acquired for the stated consideration of $ 336,400 all the coal in place in and underlying the land, and the mining rights and privileges associated thereto with respect to all three tracts. He did not acquire surface mining rights by the deed, other than the right to use the surface of the land normally associated with deep mining operations. [2]
Of the total $ 336,400 consideration, $ 300,000 was attributable to the parcel of land defined in the deed as "GREAT TRACT NUMBER ONE (1)," which constituted the approximately 1,420-acre tract along Hurricane Branch (Fork) which was the subject of discussion between Neilan and Jones. Of the $ *596 300,000, $ 25,000 was paid in cash and $ 275,000 was in the form of a negotiable promissory note, bearing interest at 8 percent per annum, from Neilan, his wife, and Lunking to the grantors of the coal in place. The $ 275,000 note was secured by a deed of trust dated April 1, 1976 from Neilan and his wife. The deed of trust was executed by Neilan and his wife on October 5, 1976, and filed in the Boone County Commission Clerk's Office on October 13, 1976. Under the terms of the $ 275,000 note, semi-annual installments of $ 25,000 were payable on October 1 and April 1 of each year until April 1, 1981, when the entire remaining amount became due. The semi-annual installment payments were made from 1976 through 1979. Jones selected the western half of the tract to lease from Neilan and a division was made up the hollow (Hurricane Branch) so that one road up the hollow could service both western and eastern halves. The mine at issue herein (Hereinafter referred to as the "Boone mine") was opened north of Hurricane Branch. In a revised report, dated October 15, 1976, Conaway estimated the portion of the reserves set forth in his February, 1976 report which were located on the *597 western half of the total tract, but limited his estimates to the Peerless and Cedar Grove seams. Neilan retained the eastern half of the 1,420-acre tract and leased it in 1977 to an entity known as the Alma Coal Properties Partnership which, in the summer of 1978, opened a mine approximately 500 feet from the Boone mine south of Hurricane Branch (hereinafter referred to as the "Manila mine"). Of the $ 300,000 stated purchase price to be paid by Neilan for the coal in the entire 1,420-acre tract, $ 150,000 was attributable to the western half. Prior to entering into a final lease, Landesman asked the Miller firm for an economic feasibility study on the property. On August 11, 1976, Miller Management Co., Inc., a Miller subsidiary (hereinafter the parent and its subsidiary will collectively be referred to as "Miller"), rendered a preliminary report which concluded that the property was mineable. Miller also undertook in its report to manage the property. On October 1, 1976, Miller submitted a final report to Neilan, with copies to Jones and Landesman. Miller estimated the cost of mining coal and delivering it to the ground outside the mine at $ 15 to $ 16 per ton, with an assumed *598 production at 200,000 tons per year. The assumption that 200,000 tons per year was recoverable was based on Conaway's report. Miller estimated that $ 550,000 would initially be required to capitalize the mining operation. In September, 1976, the Blair Mott Drilling Corporation performed one core drilling on the western half of the 1,420-acre tract (hereinafter the "Blair Mott core drilling"). The core drilling was performed for United Equity Corporation, an investment syndication group that was considering leasing some of the reserves. The group had access to the Conaway report, but wanted further confirmation of the report. Neilan had access to the results of the core drilling, and made the results known to Conaway and to LJP. On October 27, 1976, Neilan (individually) and LJP Partners ("LJP"), a Connecticut general partnership comprised of Landesman, Jones, and Palermo, executed a 10-year lease of the coal in the Peerless and Cedar Grove seams underlying the western half of the 1,420-acre tract (hereinafter, this document will be referred to as the "lease"). Under the terms of the lease, LJP was to pay Neilan a tonnage royalty of $ 1.62 per ton of merchantable coal mined, *599 removed and sold and LJP agreed to pay to Neilan an $ 800,000 advanced royalty on or before December 31, 1976, subject to recoupment against the tonnage royalty on the first 1,290,323 tons of coal mined at the rate of $ .62 per ton. LJP paid $ 675,000 to Neilan in cash on December 31, 1976, and executed a $ 125,000 note for the remainder of the $ 800,000 advanced royalty. The note was not paid. Neilan also agreed that, simultaneously with payment of the advanced royalty, he would contribute $ 500,000 to initially capitalize Boone Resources Inc. ("Boone Resources"), a West Virginia corporation to be formed for the purpose of conducting mining operations on the property. [3] Boone Resources was subsequently formed on November 29, 1976, and Neilan was its president. The $ 500,000 used to capitalize Boone Resources came from the proceeds of the $ 675,000 cash portion of the advanced royalty. Neilan also deposited $ 50,000 from these proceeds into an escrow account to assure one year's payment on the $ 275,000 note to the grantors of the coal in place. *600 The advanced royalty payment was conditioned on Neilan delivering to LJP, on or before December 31, 1976, at LJP's option, either a counterpart of the lease signed by Neilan's wife or an instrument executed by Neilan's wife subordinating her dower right in the leased property to the lien of the lease. If a subordination agreement or lease counterpart was not delivered to LJP on or before December 31, 1976, LJP would be released from its obligation to pay the advanced royalty. On October 27, 1976, a Certificate of Limited Partnership for Boone County Coal Properties ("Boone"), a West Virginia limited partnership, was executed by Richard Guthrie ("Guthrie") as general partner and Landesman as limited partner. The stated purpose of Boone was to acquire the right to mine certain coal properties in West Virginia pursuant to a sublease agreement (dated as of October 27, 1976) entered into by LJP and Boone, and to mine the coal. Additional limited partners could be admitted upon the consent of Guthrie and Landesman. LJP and its individual partners (Landesman, Jones and Palmermo) were the promoters and "parents" of Boone. Guthrie was selected and requested to serve as the general partner *601 of Boone by LJP. As of 1976, Guthrie had no experience in operating a coal mine or had ever been responsible for extracting coal from the ground. Prior to 1976, Guthrie had served as a mining specialist with Manufacturer Hanover Trust Company and as a securities analyst with Irving Trust Company. On October 27, 1976, LJP and Boone executed a 10-year sublease (hereinafter the "sublease") of the coal in the Peerless and Cedar Grove seams on and underlying the same lands described in the Neilan-LJP lease. The sublease was signed by Landesman, Jones and Palermo for LJP, and Guthrie for Boone. Under the sublease, Boone was to pay LJP a tonnage royalty of $ 2.70 per ton of merchantable coal mined, removed and sold and Boone agreed to pay to LJP a $ 5,025,000 advanced royalty on or before December 31, 1976, subject to recoupment against the tonnage royalty on the first 2,010,000 tons of coal mined at the rate of $ 2.50 per ton. Furthermore, the sublease provided that a minimum annual royalty of $ 10,000 per year for each year during the term of the sublease was to be paid to LJP "whether or not the tonnage royalty on coal actually mined, removed and sold from the Property during each *602 such year shall produce a sum equal to said Minimum Annual Royalty." Pursuant to the sublease, the $ 5,025,000 advanced royalty was payable to LJP in cash of $ 1,525,000 and by a $ 3,500,000 promissory note. The $ 3,500,000 note was dated December 31, 1976, matured on December 31, 1987, was nonnegotiable and bore interest at 6 percent per annum. Interest was due on December 31, 1977. Thereafter, the outstanding principal, together with interest, was payable in quarterly installments of $ 115,000, with a final installment of $ 223,258 due on the maturity date. Boone had the right, upon a minimum payment of $ 2,500 of any installment ("mandatory minimum payment"), to defer until the maturity date the payment of the remainder of the installment. In any event, the minimum amount to be paid per quarter was $ 2,500, or $ 10,000 per year. If the mandatory minimum payment was not made, LJP had the right to declare the balance due. Boone was obligated to prepay the note in the amount of $ 2.30 per each ton mined and sold from the property, which prepayments would be applied to the quarterly payments. The note was without recourse to Boone, its general partners or any limited partners, *603 and was secured by a mortgage and security interest in all Boone's interest in the property that was the subject of the sublease. LJP's sole remedy in event of default was to terminate the sublease and foreclose. The terms and provisions of the sublease, the note and the mortgage were determined by LJP. The simultaneous lease of the property by Neilan to LJP for an advanced royalty of $ 800,000 was structured by LJP. Neilan, Landesman, LJP and Boone relied on Conaway's estimated reserves with respect to the decisions to purchase the western half of the 1,420-acre tract for $ 150,000, lease it for an advanced royalty of $ 800,000 and sublease it for an advanced royalty of $ 5,025,000, and on the Miller report in determining the feasibility of the mining operation. Neither the lease nor sublease included a metes and bounds description of the property subject thereto. On November 24, 1976, George T. Ikner, Jr. ("Ikner") rendered a title opinion to Boone upon Neilan's request. The title opinion pertained to the property described in the lease, i.e., the western half of the tract, which in fact consisted of nine smaller tracts. The title opinion provided that the actual likelihood *604 of failure of title in the properties was small, except for two of the nine tracts (John T. Ellis and Robert Ellis). The private placement memorandum (see p. 13 et seq., infra) stated that Boone's title with respect to these excepted portions of Boone's leasehold interest (affecting approximately 515,000 recoverable tons of coal) was highly questionable. Because of the defects in title, Neilan leased the Alma seam to LJP as security in the event of any title problems which would impare LJP's mining capabilities. LJP, in turn, leased the Alma seam to Boone. No additional royalty was required for the Alma seam. Various documents were executed on or about November 22, 1976, whereby Neilan's wife agreed to the various transactions to which Neilan was a party and released any dower interest. On October 27, 1976, Boone Resources and Boone entered into a contract mining agreement. Pursuant to the agreement Boone was to pay Boone Resources $ 17.00 per ton for coal production (mining, processing, transportation, marketing) of the Peerless and Cedar Grove seams covered by the sublease. Boone Resources agreed to the supervision of the management of all phases of the mining operations *605 by Miller. In addition to all mining operations, Boone Resources was responsible for the procurement of purchase orders or long-term contracts. The contract mining agreement could be terminated by Boone without cause upon 30 days written notice, and by Boone Resources upon the lawful termination of the sublease. By a management agreement dated as of October 27, 1976, between Boone, Boone Resources and Miller, Miller agreed to manage the mining operations of Boone in return for its engineering costs and ordinary and necessary expenses, plus 20 percent above the total costs, and $ .50 per ton of coal shipped and sold. All compensation required to be paid to Miller by the terms of the agreement was payable by Boone Resources. Under the management agreement, Miller was to supervise Boone Resources in the performance of its obligations under the mining agreement. Miller, for example, was to recruit, hire, supervise and discharge all mining personnel, represent Boone Resources in contract negotiations for the sale of coal, and develop additional markets for coal produced. Neilan had a two-thirds interest in Boone Resources; Lunking had a one-third interest. By pledge agreements, *606 the stock of Boone Resources was pledged to Boone to secure performance by Boone Resources on the contract mining agreement. In November, 1976, by four agreements (base leases), Neilan acquired the right to surface mine certain portions of the 1,420-acre tract, and assigned his rights to LJP. On November 26, 1976, Boone issued its private placement memorandum. At the outset, the private placement memorandum warned that: THE INVESTMENT DESCRIBED HEREIN IS HIGHLY SPECULATIVE. INITIAL DEVELOPMENT OF A COAL MINING PROPERTY MUST BE CONSIDERED A HIGH RISK UNDERTAKING AND SHOULD BE CONSIDERED ONLY BY SOPHISTICATED INVESTORS WHO HAVE SUBSTANTIAL NET WORTH AND CAN FULLY AFFORD A COMPLETE LOSS OF THEIR INVESTMENT. Furthermore, it was provided that: Prospective investors reading this memorandum should be aware that one of the most important potential benefits of an investment in the Partnership is a Partner's ability to deduct on his personal Federal income tax return his proportionate share of the Partnership's losses. However, the deductibility by the Partnership in 1976 of its $ 5,025,000 advance royalty payment involves substantial questions; particular attention should therefore *607 be paid to the tax aspects of this Memorandum. [Emphasis supplied.] The private placement memorandum went on to detail specifically the mining and business risks inherent in an investment in Boone. For example, prospective investors were made aware that: 1. The Partnership has not received title insurance or an unqualified opinion of counsel with respect to title to its leasehold interest in the Property, although the Partnership has received an opinion of special counsel to the effect that with respect to the major portion of the Property, the actual likelihood of a failure of title is small. However, its title with respect to a portion of its leasehold interest is highly questionable. Consequently, no assurances can be given that the Partnership will not encounter title problems with respect to all or a portion of its leasehold interest which may affect its ability to profitably mine and sell coal from the Seams on the Property. (See Description of the Property -- Title, below) 2. The exploration for and the mining of coal is presently being pursued by many companies substantially larger in size and with greater resources than the Partnership and the General Partner. *608 Such companies will be competitors of the Partnership, will be in a better position than the Partnership to withstand temporarily depressed markets and other adverse economic conditions and may be able to supply larger quantities of coal to their customers and to potential customers of the Partnership than can be supplied by the Partnership. (See Competition and Regulation, below) 4. [sic] Coal competes with oil and gas, atomic energy, hydro-electric power and other forms of energy, both domestic and imported, the availability and cost of which affects the demand for coal. Governmental regulations exist with respect to the mining and use of coal, including, without limitation, minimum safety and health standards and environmental considerations. In addition, legislation is continuously being proposed and considered by Federal, state and local legislative bodies which would impose certain requirements on companies engaged in the coal business. Any of the foregoing, together with any other present or future regulations or restrictions, may have an adverse effect on the ability of the Partnership to mine, sell and/or dispose of coal on a commercially profitable basis. (See Competition *609 and Regulation, below) 4. No assurances can be given that purchasers for the Partnership's coal can be found or that transportation on commercially reasonable terms or the permits necessary therefor will be available for the delivery of such coal. In addition, the possibility exists that there may be difficulty in selling at favorable prices coal that the Partnership mines from the Property. Unless a market is available for coal at the anticipated production rate, the cost of production per ton may be adversely affected by a lower production rate. Mining companies often seek to reduce these risks by contracting in advance to sell a major portion of their anticipated output at predetermined prices to coal users. Although the General Partner has conducted preliminary discussions with coal users, no such contracts have been entered into or are likely to be entered into prior to the Closing Date. 5. Although the reports of the Robinson & Robinson Division of NUS Corporation ("Robinson & Robinson"), dated as of February 5, 1976, and October 15, 1976, attached hereto as Exhibit B. (collectively the "Robinson & Robinson Report") indicate the existence of substantial recoverable *610 coal reserves under the Property based upon the prospecting techniques employed, there is no assurance as to the actual amount of such coal reserves or that such reserves are physically or economically recoverable. 6. The Partnership and Resources intend to mine and develop the Seams in accordance with the program set forth in a letter, dated October 1, 1976, from J. W. Miller & Associates, an affiliate of Miller, a copy of which is attached hereto as Exhibit C (the "Miller Letter"). However, while such study projects a rate of production of marketable coal from the Seams on the Property of approximately 200,000 tons per annum by January 1978, there is no assurance that such rate of production will be achieved by that date or at any other time. 7. Coal samples obtained on the Property have been analyzed for moisture, ash, B.T.U. and sulphur content. The results of these analyses are set forth at page 11 of the February 5, 1976 segment of the Robinson & Robinson Report. Although the General Partner believes that such tests indicate a marketable metallurgical coal, there is no assurance that such will be the case. 8. Market prices of coal are subject to wide fluctuations. *611 Principal factors affecting market prices include the manner in which the coal is sold (spot or long-term contracts) and changes in quantity and quality demands of users. In the event that the prices at which the Partnership is able to sell its coal are not in excess of the sum of its mining costs, taxes, commissioners, royalties, fees, required payments of principal and interest on its Note to LJP and other obligations and other costs, the Partnership may be unable to meet all of its obligations and may stop mining operations. In either event, it runs the risk that because of its inability to pay its fixed obligations on the Note to LJP, it may forfeit the Property. (See Description of the Sublease, The Note and The Mortgage, below) In such event, the Limited Partners may lose their entire investment and suffer adverse tax consequences. In addition, any stoppage of mining activities by the Partnership may cause it to terminate the Contract Mining Agreement which would then require the Partnership to purchase or otherwise acquire the machinery and equipment owned or used by Resources. (See Description of the Contract Mining Agreement, below) The Partnership would be adversely *612 affected by its inability to replace Resources or by its being required to pay a contract miner amounts in excess of the amounts provided for in the Contract Mining Agreement. The Partnership may also be adversely affected by variations in the quality of the coal which it mines, causing it to be unable to meet the specifications of any purchasers of its coal. Accordingly, as indicated above, there can be no assurance as to the prices, if any, which the Partnership will be able to obtain for a substantial portion of its anticipated coal production or that such prices will be sufficient to warrant the Partnership's continuing mining operations. Also, to the extent the Partnership obtains long-term contracts for the sale of coal at a specified price per ton and the market price for coal subsequently rises, the Partnership's sales made pursuant to said contracts might be required to be made at a price less than the then current market price. 9. Under and subject to the terms of the Contract Mining Agreement, Resources is required to furnish contract mining, sales, processing and transportation services for the Partnership at a base price of $ 17.00 per ton, inclusive of sums paid *613 to Miller under the Management Agreement. That base price of $ 17.00 per ton will increase on a dollar for dollar basis to reflect any increased costs incurred by Resources with respect to miners' wages or benefits or other direct labor costs. In addition, the Partnership is required under the Contract Mining Agreement to absorb cost increases incurred by Resources in performing its services thereunder to the extent such increases cause Resource's [sic] costs to exceed $ 17.50 per ton. Furthermore, after 200,000 tons of coal have been mined or after two years, whichever occurs first, Resources may request that the price paid by the Partnership to Resources for its services under the Contract Mining Agreement be on a cost plus basis, which would increase the price paid by the Partnership for Resources' services. (See Description of Contract Mining Agreement and Description of Management Agreement, below) Labor, trucking, explosives and other expenses may increase beyond present levels due to inflation, labor conditions, material shortages, the impact of a national energy crisis and other factors. Variations in levels of productivity and the need for additional equipment may also *614 affect costs. In addition, costs may increase as a result of the enactment and enforcement of laws and regulations regulating business activities affecting the environment and/or health and safety. It is unlikely that the Partnership will be able to absorb such cost increases since it will have minimal working capital; consequently, unless the Partnership can pass such cost increases to its customers by selling coal at increased prices, the Partnership will probably be forced to cease operations. 10. The Contract Mining Agreement extends for the life of the Sublease but it may be terminated for any reason by the Partnership upon 30 days' written notice. In the event that Resources either defaults in any of its obligations under the Contract Mining Agreement or is unable or is unwilling to perform satisfactorily, the Partnership may be required to find one or more persons, other than Resources, to perform the mining services. There can be no assurances that the Partnership will be able, if necessary, to find one or more satisfactory replacements for or additions to Resources or, even if it can, that it will be able to do so without thereby increasing the costs of the Partnership's *615 operations to an unprofitable level. In addition, among the principal factors affecting the Partnership's ability to mine 200,000 tons of coal in any year is the availability of mining services at cost levels which would permit the Partnership to mine such coal profitably. The failure of Resources to perform its obligations under the Contract Mining Agreement, unless it were satisfactorily replaced, may result in the Partnership being unable to mine and sell enough coal to generate revenues sufficient to fulfill its payment obligations under the Note or to pay the Annual Royalty, which nonpayment would constitute a default under the Sublease and the Note and could cause the Partnership to forfeit the Sublease. (See Description of the Sublease, below) 11. The success of the Partnership's mining operations will be dependent to a great extent on the ability of Resources to market coal mined from the Property. To the extent that Resources is unsuccesful in its marketing activities, the Partnership may have to use other marketing services or create its own marketing staff at a significant cost. Such additional costs could increase the Partnership's operating expenses to an unprofitable *616 level. The failure of Resources to provide the Partnership with orders for coal which Resources is required to mine, unless alternative satisfactory orders were obtained, may result in the Partnership being unable to mine and sell enough coal to generate revenues sufficient to fulfill its payment obligation under the Note or to pay the Annual Royalty, which non-payment would constitute a default under the Sublease and the Note and could cause the Partnership to forfeit the Sublease. (See Description of the Sublease, below) The Partnership has no prior experience in the management of coal development ventures and thus will be dependent to a significant degree on Miller and Resources. 12. The possible imposition of mandatory price controls or allocations of various energy sources, including coal, or other similar measures could have an adverse effect on the Partnership's operations. It is also possible that a reduction in oil or gas prices or increasing use of other energy sources may reduce the demand for and the price of coal, thereby making the Partnership's proposed mining activities either less profitable or unprofitable. A reduction in the price of coal could also result *617 at any time that available coal supplies exceeded the demand for coal. Since a significant portion of the coal mined in the United States is exported, any adverse economic conditions abroad could have an adverse effect on the ability of coal producers, especially smaller entities such as the Partnership, to market their coal domestically. 13. Coal mining activities involve hazards such as possible high wall slides, roof callapses, blast related damages and the leakage of dangerous gases into mining tunnels. The Partnership may incur losses due to hazards against which it cannot insure or against which it elects not to insure because of high premium costs or other reasons. While the General Partner intends to have Resources and any other contract miner used by the Partnership maintain insurance for the Partnership against risks and in amounts which are customary for coal mining operations in the vicinity of the Property, substantial uninsured liabilities to third parties may arise, the satisfaction of which could reduce or eliminate the funds available for further operations and thereby cause the curtailment or termination of mining operations by the Partnership. Similarly, *618 the private placement memorandum specifically set forth certain tax risks attendant upon an investment in Boone, most notably that: The Partnership intends to deduct on its 1976 Federal income tax return the Advanced Royalty. Although there is authority for deducting advance royalty payments in the year paid, the matter is not free from doubt and the Partnership has not received, and will not be receiving, an opinion of counsel with respect thereto. Also, any subsequent sale or sublease of the Sublease by the Partnership could have an adverse effect on the deduction of the Advanced Royalty. Potential investors are strongly urged to review the deductibility of the Advanced Royalty with their own tax advisor prior to investing. Particular attention should be paid to the October 29, 1976, Information Release 1687 of the Internal Revenue Service with respect to the deductibility of advanced royalty payments, a copy of which is annexed hereto as Exhibit D, and potential investors are cautioned that there is a substantial risk of disallowance of such deduction and a substantial risk that the Partnership would not prevail if the matter were litigated. Attached to the private *619 placement memorandum were copies of the Conaway and Miller reports and two sets of unaudited financial statements derived therefrom, prepared by the certified public accounting firm of Elmer Fox, Westheimer & Co. These statements included projected cash flow and income statements for the years 1976 through 1985 for Boone as an entity, as well as individual projections of "cash flow and tax savings (cost)" per whole unit investment (i.e. $ 50,000) in the partnership assuming a 50, 60 or 70 percent tax bracket. As the notes to the first set of statements explain, for purposes of deriving the projections found therein, it was anticipated that the Boone mine would commence operations in December, 1976, and it was assumed that production in that month would aggregate 2,000 tons; in 1977 at the annual rate of 80,000 tons, and thereafter at the annual rate of 200,000 tons (i.e., 1,682,000 tons through 1985). It was also assumed that the net selling price, after deduction of a 15-percent shrinkage factor, would be $ 23.375 per ton, and that the amount to be paid to Resources as contract miner was $ 17.00 per ton. Moreover, the projections assumed that Boone would be entitled to deduct *620 the full amount of the advanced royalty of $ 5,025,000 in 1976, and explained that depletion would be computed on the percentage method. The following is the "Statement of Projected Cash Flow and Tax Savings (Cost)," assuming a 50-percent tax bracket and a $ 50,000 investment in the partnership: BOONE COUNTY COAL PROPERTIES
(A West Virginia Limited Partnership)
STATEMENT OF PROJECTED CASH FLOW AND TAX SAVINGS (COST)
(Per Unit for Thirty-Two and One-Half Units)
(Unaudited)
Assuming 50% tax bracket for 100% share
Cumulative
Tax
Tax
Cash
cash
gain
savings
Cash
Year
contributions
contributions
(loss)
(cost)
flow
1976
$ 50,000
$  50,000
$  (153,078)
$  76,544 $      -
1977
50,000
2,865 (1,433)
5,064
1978
50,000
12,122 (6,061)
16,675
1979
50,000
12,363 (6,182)
16,675
1980
50,000
12,634 (6,317)
16,675
1981
50,000
12,876 (6,438)
16,675
1982
50,000
13,238 (6,619)
16,675
1983
50,000
13,508 (6,754)
16,675
1984
50,000
13,840 (6,920)
16,675
1985
50,000
14,383 (7,191)
16,675
$  (45,258)
$  22,629
$ 138,464
Cumulative
Cumulative
excess of cash flow
Cash flow
cash flow
and net after
and net after
and net after
tax savings over
Year
tax savings (cost)
tax savings (cost)
investment
1976
$  76,544
$  76,544
$  26,544
1977
3,631
80,175
30,175
1978
10,614
90,789
40,789
1979
10,493
101,282
51,282
1980
10,358
111,640
61,640
1981
10,237
121,877
71,877
1982
10,056
131,933
81,933
1983
9,921
141,854
91,854
1984
9,755
151,609
101,609
1985
9,484
161,093
111,093
$ 161,093
*621 The accompanying information and assumptions relating to projections are an integral part of this statement. The private placement memorandum also provided a second set of projections based on the assumption that the Internal Revenue Service would take the position that the advanced royalty was not fully deductible from gross income in the year paid (1976), but instead allowable as a deduction ratably over the period the coal was to be mined and sold. In all other respects, these alternative projections were based on the same assumptions as discussed supra at p. 19-20. [4] The following is the "Statement of Projected Cash Flow and Tax Savings (Cost)," assuming a 50-percent tax bracket and a $ 50,000 investment in the partnership, as modified in the private placement memorandum for the change in treatment of the advanced royalty: BOONE COUNTY COAL PROPERTIES
(A West Virginia Limited Partnership)
STATEMENT OF PROJECTED CASH FLOW AND TAX SAVINGS (COST)
(Per Unit for Thirty-Two and One-Half Units)
(Unaudited)
Assuming 50% tax bracket for 100% share
Cumulative
Tax
Tax
Cash
cash
gain
savings
Cash
Year
contribution
contributions
(loss)
(cost)
flow
1976
$  50,000
$  50,000
$  (1,684)
$     842 $    -
1977
50,000
663 (332)
5,064
1978
50,000
6,634 (3,317)
16,675
1979
50,000
6,844 (3,422)
16,675
1980
50,000
7,116 (3,558)
16,675
1981
50,000
7,388 (3,694)
16,675
1982
50,000
7,719 (3,860)
16,675
1983
50,000
8,020 (4,010)
16,675
1984
50,000
8,322 (4,101)
16,675
1985
50,000
8,685 (5,343)
16,675
$  59,706 $ (29,854)
$ 138,464
*622 Cumulative
Cumulative
excess of cash flow
Cash flow
cash flow
and net after
and net after
and net after
tax savings over
Year
tax savings (cost)
tax savings (cost)
investment
1976
$     842
$     842
$ (49,158)
1977
4,732
5,574
(44,426)
1978
13,358
18,932
(31,068)
1979
13,253
32,185
(17,815)
1980
13,117
45,302
(4,698)
1981
12,981
58,283
8,293 1982
12,815
71,098
21,098 1983
12,665
83,763
33,763 1984
12,514
96,277
46,277 1985
12,333
108,610
58,610 $ 108,610
The accompanying information and assumptions relating to the projections are an integral part of the projected statement. (Assuming the advanced royalty *623 paid during 1976 is deducted ratably over the period the coal is mined and sold.) On December 31, 1976, a first amendment to certificate of limited partnership was executed and dated as of November 1, 1976, by Guthrie, as general partner and acting on behalf of later limited partners, and Landesman. The cash contributions were stated to be: Guthrie -
$     1,000
Landesman -
100
Later limited partners
1,625,000
Total
$ 1,626,100
There were 18 later limited partners, including: Limited Partner
Capital Contribution
L & N Associates
$ 125,000
Wickham Partners
775,000
Total
$ 900,000
Highboro Associates was also one of the later limited partners, with a stated cash capital contribution of $ 65,000. Petitioner Jim Zegeer ("Zegeer") was a reported partner of Highboro Associates in 1976, and contributed $ 5,000 to the capital of Boone on December 30, 1976. Zegeer had the right to .3014 percent of the profits and losses of Boone, through Highboro Associates in 1976 and individually in subsequent years. The proceeds of the Boone offering were to be used as follows: Advanced royalty (cash portion)
$ 1,525,000
Legal and accounting
45,000
General partner's management fee
30,000
Working capital
26,100
Total
$ 1,626,100
*624 To the extent the legal and accounting fees exceeded $ 45,000, the excess was to be paid by LJP. LJP intended to use the $ 1,525,000 cash portion of the advanced royalty as follows: Advanced royalty to Neilan
$   800,000
Brokerage and finders fee
60,000
Working capital
665,000
Total
$ 1,525,000
The $ 665,000 "working capital," less certain commissions and fees in excess of the $ 45,000 in organization expenses, was to be profit to LJP. The Boone offering was on an all or nothing basis. Under the terms of the offering, Landesman had to sell all of the Boone units or return the money. As the promoter of Boone, Landesman did not sell all the units to outside investors by the end of December, 1976. Accordingly, Landesman and Palermo formed Wickam Partners ("Wickam") and contributed $ 775,000 to Boone. Landesman had a 47 percent interest in Wickam, whose reported proportionate loss from Boone for 1976 was $ 2,374,319. Landesman and Palermo borrowed the $ 775,000 they contributed to Boone from the Chemical Bank in late December, 1976, and paid the $ 775,000 back to Chemical Bank in January, 1976, out of the $ 1,525,000 proceeds *625 that went from Boone to LJP for cash portion of the advanced royalty. Neilan received $ 675,000 in cash from LJP for the advanced royalty. Of this amount, $ 500,000 was used to capitalize Boone Resources; $ 50,000 was put into escrow to assure one year's payment on the $ 275,000 note to the third parties under the deed; and $ 125,000 was treated as L & N's capital contribution to Boone. After the first year's payments on the $ 275,000 note to the third-party grantors of the coal in place ($ 50,000), default on the note was prevented for one year by using funds from the Alma Coal Properties Partnership associated with the eastern half of the 1,420-acre tract. Under Miller, mining operations (road construction, mine site) were to commence in November, 1976. Mining permits were to be obtained by November, 1976, and there was to be production in 1976. As of the end of 1976, Boone obtained no permits, conducted no mining operations and sold no coal. On its 1976 return (1065), Boone claimed a $ 5,025,000 deduction for the advanced royalty. Boone also claimed a deduction of $ 30,000 for the general partner's management fee and $ 25,000 for professional fees for tax advice. The total *626 loss claimed by Boone was $ 5,080,000. Petitioners claimed a $ 15,318 loss from Boone (through Highboro Associates) in 1976. Post-1976 Events
In the spring of 1977, Landesman became involved in the Boone mining operations. Landesman was not satisfied with Guthrie's performance as a general partner with respect to his non-administrative duties in operating Boone. On July 6, 1977, Boone Resources obtained a certificate of approval for mine openings for the Peerless seam. In August, 1977, Landesman asked Miller for the termination of the management agreement, and Miller, upon securing consent from Boone, cancelled the agreement. Miller's proposed schedule for mining called for the completion of the road, pond and face up, and a single shift operation on a single section of mining by June - July, 1977, which, at the time of termination, had not been met. Landesman contacted Robert Wolfe ("Wolfe") of Kelley, Gidley, Blair and Wolfe, Inc. ("Kelley, Gidley") to perform engineering and management services for Boone and Boone Resources entered into a management agreement with that firm. Under the agreement, Kelley, Gidley was to supervise the mining, represent Boone Resources *627 in contract negotiations for the sale of coal, and, to the best of its ability, develop additional markets for the coal produced from the property. Boone Resources was to pay 2.6 times Kelley, Gidley's actual payroll costs, plus out-of-pocket disbursements reasonably incurred, plus, as additional compensation, 25 cents per ton for the first 100,000 tons of coal shipped and sold monthly from the property per year, and 50 cents per ton for each ton shipped and sold in excess thereof. Wolfe's day-to-day contracts were with Landesman. Wolfe had signature authority with Guthrie on all Boone Resources' checks. On September 7, 1977, Boone Resources and Jerry Thompson, d/b/a Carrie Lynn Coal Company ("Carrie Lynn") entered into a subcontract to mine the Peerless seam. Prior to mining, Carrie Lynn was to build a road to the mine site, a pond and face up the seam. Carrie Lynn would be paid $ 45,212 for the road and pond work, and 12 percent above cost for the face up, estimated at $ 60,000. Carrie Lynn could retain the resulting coal from the face-up operation. Boone Resources agreed it would spend up to $ 30,000 to bring electricity to the mine site, and up to $ 5,000 for site work *628 needed in preparation for moving a coal processing facility onto the site. Carrie Lynn was responsible for selling the coal it mined, and for procuring a coal cleaning plant to be moved on the property within 6 months. Under the subcontract, Carrie Lynn was to commit $ 300,000 worth of machinery and document that it had $ 100,000 available in operating capital. It was contemplated that Boone Resources would expend approximately $ 140,000 in preparation of mining (road, pond, electricity and face up). As of September 28, 1977, Carrie Lynn had not documented its operating capital or its commitment of machinery. On that date, Landesman and Jerry Thompson, d/b/a Carrie Lynn, entered into an agreement appointing Landesman receiver of Carrie Lynn. [5]
As of September, 1977, Boone Resources had $ 390,000 in funds left from the $ 500,000 initial capital, having spent $ 110,000. *629 By that time, work had not commenced on the road. On October 3, 1977, Carrie Lynn moved onto the site to commence the preliminary work (road, pond and face up). On October 26, 1977, Boone Resources obtained a permit to upgrade a road to the mine site. By the end of 1977, no coal had been produced or sold by Boone. On its partnership return for 1977, Boone claimed an ordinary loss of $ 227,063. Of this amount, $ 210,000 was attributable to accrued interest on the $ 3.5 million note, and the remaining $ 17,063 to operating expenses consisting of rent and mine supervision and office costs. The minimum mandatory payments ($ 2,500 quarterly) required by the $ 3.5 million nonrecourse note were not made by Boone in 1977. Through Highboro, petitioners claimed a loss of $ 685 from Boone in 1977. From December, 1977, to March, 1978, there was a coal miners' strike. The preliminary work at the Boone mine (road, pond and face up) took place during the strike. By April, 1978, the haul road, pond and face up had been completed. All but approximately $ 16,000 of the remaining $ 390,000 of Boone Resource capital (see p. 29, supra) had been expended and mining had not commenced. *630 Of the capital that was expended, $ 64,127 was paid to Kelley, Gidley for management services. Wolfe was disappointed with Thompson's performance, and accordingly, upon his suggestion, Carrie Lynn was terminated sometime after March, 1978. On April 7, 1978, Boone notified Boone Resources and Neilan of the termination of the October 27, 1976, contract mining agreement. Boone Resources was terminated because it had expended the entire $ 500,000 in capital without mining. On March 24, 1978, Guthrie sold 50 percent of his general partnership interest to Lanni Mining Enterprises, Inc. ("Lanni") and Lanni became the co-managing general partner of Boone. The president of Lanni was Morris Silver ("Silver"), an accountant from New York. On January 17, 1978, a preliminary draft report was prepared for Landesman by Kelley, Gidley evaluating various mining systems to be used in mining the Peerless seam. On March 31, 1978, Hurricane Branch Coal Company ("Hurricane") was formed as a wholly-owned subsidiary of Madison Resources, Inc. ("Madison Resources") which was owned by Landesman. Kelley, Gidley presented to Madison Resources and Hurricane a feasibility report for the Peerless seam. *631 On April 7, 1978, Madison Resources and Boone executed a contract mining agreement for the mining of the Alma and Peerless seams. Hurricane completed the preliminary work. Madison Resources was the contract miner for Madison Associates ("Madison"), a mining co-ownership formed in 1977. Madison Resources had $ 500,000 in capital as a result of the Madison syndication in 1977 covering a proposed Madison mine which was to be close to the Boone mine. Madison Resources and Hurricane drafted a proposal for the mining of the Peerless seam. The proposal called for the borrowing of $ 600,000 to be used for equipment ($ 500,000) and working capital ($ 100,000). The Conaway reports were part of the proposal. The Madison mine never operated, and the Madison investors received no return on their capital investment. Instead, the $ 500,000 of Madison Resources capital from the Madison syndication was used for the Boone mining operation in 1978, upon consent of the Madison investors. Madison Resources sold 1,100 tons of face up coal in May, 1978, for $ 21,000. Madison Resources received the proceeds of the sale. By mid-1978, Landesman believed that, if the mining was not consummated in *632 a timely manner, the Boone investors would realize income as a result of recapture measured by the amount of $ 3.5 million nonrecourse note from default on the property. Landesman believed that since the investors would realize unearned income at 70 percent levels, it would be a "major disaster" if the property were not mined. One of Landesman's objectives was to mine the property in order to preserve the $ 5 million plus tax deduction. Neilan was concerned in August, 1978 that, if Boone did not commence mining, his tax deductions would be in jeopardy. On September 1, 1978, the Boone investors were advised by letter that mining was about to commence, and that Boone had "succeeded in fulfilling the obligations to face-up the mine and, in fact, put it in a state of readiness for actual mining." Boone did not know at what price it would sell its coal, or what income, if any, could be expected out of the mine in 1978. Mining at the Boone site commenced in the fall of 1978 under the name of Hurricane. Hurricane expended approximately $ 500,000 on the mining operation, which $ 500,000 came from the Madison syndication. On October 31, 1978 a load operator was killed at the mine site. *633 As a result of the accident, the mine was closed down for a short period of time by the Mine Health and Safety Administration; after a full investigation, it was allowed to reopen. The accidental death led to a highly regulated environment at the mine, consisting of ongoing inspections, which increased the cost, and adversely affected the efficiency, of the mining operations. The mine did not operate after January 2, 1979. In 1978, the mine produced 4,466 tons of coal, but Boone sold none of this production. On November 7, 1979, Hurricane filed a petition in bankruptcy. On June 29, 1981, notice of a trustee sale of the 1,420-acre tract was given as a result of Neilan's default on the $ 275,000 note to the grantors under the deed of trust dated April 1, 1976. The foreclosure sale was conducted on July 3, 1981, and the 1,420-acre tract reverted to the grantors. No minimum mandatory payments as required by the nonrecourse note were ever made during or after 1978. On its 1981 partnership return, Boone claimed a $ 140,068 ordinary loss. Of this amount, $ 140,000 was attributable to accrued interest in the $ 3.5 million nonrecourse note. Boone also reported on that return a *634 $ 4,482,500 capital gain under section 1231. Boone reported the gain as arising from the sale of a "coal lease" acquired in October, 1976 and sold in July, 1981. The $ 4,482,500 gain equalled the discharged liabilities, calculated as follows: Nonrecourse note
$ 3,500,000
Accrued interest
980,000
Misc. accrued expense
2,500
Total
$ 4,482,500
Zegeer's distributable claimed loss from Boone for 1981 was $ 422, and his share of the reported gain was $ 13,511. Petitioners did not report the $ 422 loss of the $ 13,511 gain on their 1981 return. The initial issue for decision is whether the partnership, and through it petitioners, is entitled to the claimed deductions for an advanced royalty and management and professional fees in 1976, and for operating expenses in 1977. See pp. 26, 29, supra. The extent of petitioners' additional income for 1981 depends, at least in part, on resolution of this issue. Respondent does not dispute that "Royalties traditionally have been described as akin to rent and are deductible by the payor as a trade or business expense under section 162(a)(3)." Seaman v. Commissioner,84 T.C. 564, 588 (1985) *635 (Citations omitted). Nor does he suggest that the fees and operating expenses are not of a character which would normally qualify them as ordinary and necessary business expenses deductible under section 162. Rather, respondent argues that Boone is not entitled to the claimed deductions because the partnership's operations did not constitute an activity entered into for profit within the meaning of section 183, [6] and therefore Boone cannot be considered as being engaged in a trade or business within the meaning of section 162.[7]
*636 Hence, the relevant inquiry herein is whether the Boone mining venture was entered into with "the actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). This determination must be made at the partnership level, Taube v. Commissioner,88 T.C. 464, 478 (1987); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Siegel v. Commissioner,78 T.C. 659, 698 (1982), and although a reasonable expectation of profit is not required, it must be shown that a bona fide objective of making a profit did exist. Taube v. Commissioner, supra at 478-479; Dreicer v. Commissioner, supra at 643-645; see also Estate of Baron v. Commissioner,83 T.C. 542, 553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). The burden of proving such objective is on petitioners. Taube v. Commissioner, supra at 480. The regulations promulgated under section 183 list nine relevant factors which should be taken into account *637 in determining whether an activity is engaged into for profit. See section 1.183-2(b)(1)-(9), Income Tax Regs. However, as the regulations clearly provide, this is only intended as a partial list of the factors relevant to making such a determination and no single factor is considered determinative. Section 1.183-2(b), Income Tax Regs. Our decision as to whether Boone possessed the requisite profit objective is a question of fact which must be determined in light of all the facts and circumstances, Taube v. Commissioner, supra at 480; Estate of Baron v. Commissioner, supra at 553, section 1.183-2(b), Income Tax Regs., and not arrived at "by merely counting the factors which support each party's position." Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Accordingly, rather than analyzing each of the individual factors set forth in the regulations, "we will deal with the totality of the circumstances revealed by the record herein in the context of the factors asserted by the parties in favor of their positions." Taube v. Commissioner, supra at 480-481. See also Estate of Baron v. Commissioner, supra at 554. *638 Before proceeding with our analysis, certain preliminary observations are in order. To begin with, respondent makes much of the fact that Guthrie, Boone's general partner, was not called to testify at trial. Citing to Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947), he argues that Guthrie's absence gives rise to the inference that his testimony would not have supported petitioners' position. We disagree. In determining profit objective at the partnership level, focus is "on the intent of the general partner and the promoters of [the partnership] since it is these individuals who actually controlled the partnership's activities." Fuchs v. Commissioners,83 T.C. 79, 98 (1984) (emphasis added). See also Taube v. Commissioner, supra at 480. We were favored at trial with extensive testimony by Landesman, the chief promoter of the syndication, whom respondent himself refers to as "the driving force of the Boone promotion." We found such testimony not only convincing and forthright, but generally supported by the other evidence we saw and heard. Accordingly, *639 while Guthrie's testimony would most certainly have been welcomed, not only do we decline to draw any adverse inference from his absence at trial, but we do not think it was incumbent on petitioners to call him as a witness in order to carry their burden of proof. Moreover, we emphasize at the outset, especially in view of the large amount of evidence submitted in this case which deals with events surrounding the partnership's activities after Boone's syndication in 1976, that "the focal point with respect to our analysis should be at the beginning of the transaction and that our decision should not be based on objective hindsight." Taube v. Commissioner, supra at 480. See also Smith v. Commissioner,78 T.C. 350, 392 n.32 (1982), affd. without opinion 820 F.2d 1220 (4th Cir. 1987). Hence, we have formulated our conclusions herein as to whether the partnership possessed the requisite profit objective under section 183 by evaluating the facts and circumstances as they existed during the latter part of 1976. Respondent argues that "the Boone promotion was entirely tax motivated and economically doomed from the outset" and is thus but *640 the latest in a long line of cases decided by this Court dealing with "artificial, inflated deductions arising from unsound tax avoidance coal mining schemes circa 1976." See, e.g., Capek v. Commissioner,86 T.C. 14 (1986); Seaman v. Commissioner, supra;Thomas v. Commissioner,84 T.C. 1244 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Ramsay v. Commissioner,83 T.C. 793 (1984). We disagree. While the matter is not entirely free from doubt, we think the record reveals sufficient evidence for us to conclude that, although the Boone promotion was a risky venture which failed to live up to its economic expectations, it was entered into with a bona fide objective to make a profit. Respondent sets forth numerous arguments in support of his position. However, the primary consequences upon which he has based his case is that it was unreasonable for the partnership to have relied on the Conaway and Miller reports in formulating its decision to go ahead with the investment. Respondent essentially argues that Conaway's efforts in investigating the property were inadequate and, as a result, his reports, which *641 were used as a basis for the tonnage projections found in the private placement memorandum and for the Miller economic feasibility study, were incomplete and misleading. Respondent also takes issue with the cost per ton estimates found in the Miller report as well as with Miller's estimate of the amount of initial capital required to get the Boone operation off the ground. Conaway's revised report, dated October 15, 1976, estimated that there were 2,597,000 proved recoverable tons of coal [8] located in the western portion of the Cedar Grove and Peerless seams. [9] To arrive at these figures Conaway [10] made 6 measured outcrop exposures of each of the seams, [11] from which he concluded that Cedar Grove seam averaged between 40 and 50 inches in thickness and that the Peerless seam's average thickness was from 34 to 35 inches. [12] In turn, he derived the gross tons-in-place for each of the seams by multiplying the total coal acres per seam by an average of each seam's thickness. [13]
*642 Respondent's expert, Thomas Howard ("Howard"), both in his report and through his oral testimony, calls into question Conaway's methods and conclusions. Initially, he criticizes Conaway's reliance on information supplied to him by Lunking and Neilan in formulating his reports, and concludes, "as a result, the report has no substantiation. And as far as I'm concerned, it's meaningless. He has taken information that the owners' supplied him with and made a report from it." While we recognize that Conaway did rely to a certain extent on the preliminary investigations and continued help of Lunking and Neilan in putting together his study, we think it abundantly clear from the record that, in carrying out the assignment, he carefully supervised all facets of the project (see, e.g., note 10, supra) and that his conclusions were based on well-reasoned analysis. Contrary to the inference Howard seems to suggest, we are convinced that Conaway did not merely regurgitate information provided to him by Neiland and Lunking, but instead digested this information, evaluated it, supplemented it with additional data, and, by drawing on what became apparent at trial was his vast amount of *643 experience with respect to the coal reserve in the geographic area involved herein, formulated his own independent basis for the results found in his reports. [14] We find the situation herein quite different from that which existed in Thomas v. Commissioner, supra at 1273. In the same vein, we disagree with Howard's criticism that the Conaway reports were unacceptable and his results were unsubstantiated and should therefore be disregarded before they contained no pictures or sketches of the outcrop exposures or details as to where these exposures were made. While we agree that his reports might have been more illustrative, we think Conaway's testimony leaves no doubt that the estimates found therein were supported by the results of his investigation. *644 From a more technical standpoint, Howard questions the reliability of Conaway's estimates because Conaway took no core drilling samples of the seams. A core drilling, as its name implies, is a process by which a diamond drill head is used to bore deep into a mountain to take a core sample of the mountain. Howard argues that, in order to assure that proven reserves exist throughout a coal seam, such core drillings must be made in addition to making outcrop exposures. In the case of the Boone property, he concludes that three such drillings should have been made by Conaway in order to confirm his findings. Conaway, on the other hand, defends his decision not to make any such drillings and claims that given the number of outcrop measurements he made, core drillings were not needed to establish that proven reserves existed in the Peerless and Cedar Grove coal seams. Similarly, Thomas Gales ("Gales)", another West Virginian mining engineer who testified as an expert at trial, buttressed Conaway's opinion and command that, given the small acreage of the property at issue, core drilling was not required and that "there were enough outcrop measurements for me to make a determination of *645 the coal reserve on the area effected." Gales also testified that the standards utilized by Conaway in evaluating the property were almost identical to those used by his company in 1976 and complied with the general standard set forth in Geological Survey Bulletin 1450-B: Coal Reserve Classification System of the U.S. Bureau of Mines and U.S. Geological Survey (hereinafter referred to as "Bulletin 1450-B"), a report published jointly by the U.S. Bureau of Mines and the U.S. Geological Survey, which sets out general guidelines for the industry for determining whether a given coal reserve is proven or not. Bulletin 1450-B does not list core drilling as an essential requirement in establishing a proven reserve. Accordingly, we attach no significance to the fact that no drill cores were made on the property. [15]
*646 Finally, with respect to the Conaway report, Howard also argues that Conaway failed to make enough outcrop exposures on each of the seams. For example, Howard opined that 90 outcroppings, in contrast to the six made by Conaway, were necessary to establish that proven reserves existed in the Peerless seam. He reasoned that to establish that a reserve is proven an outcropping must be made every 500 feet along a seam, and, since Conaway's reports indicated that the Peerless seam was approximately nine miles long (i.e., about 45,000 feet), 90 exposures were required. We disagree, and find that the six exposures made by Conaway [16] were sufficient to support his estimates. *647 To begin with, under the guidelines set out in Bulletin 1450-B, to establish that a reserve be classified as proven (the actual terminology used in the Bulletin is "Measured") points of observation must be no greater than 1/2 mile apart (i.e., approximately 2600 feet), not the 500 feet suggested by Howard in his report, and measured coal is projected to extend as a 1/4 mile (i.e., approximately 1300 feet) wide belt from the outcropping. Thus, according to these general guidelines, only 17 outcroppings would be required to establish that the reserves in the Peerless seam fell into the measured or proven category (45,000/2600). However, as we think Conaway correctly suggested at trial, this number could be even further reduced to account for the fact that coal seams do not simply lie in a straight line extending from point A to point B. To the contrary, they tend to snake in and around the hillside, so although a given point in a seam may, for example, lie linearly five miles from another point in that same seam, it may only lie a couple thousand feet as the the crow flies. Moreover, while Bulletin 1450-B sets out general guidelines to be followed by the industry, it recognizes *648 that consistency of coal seams varies from region to region, and we think the experience of the mining engineer with respect to a given region cannot be overlooked in determining the correct number of outcroppings necessary to establish proven reserves. Accordingly, we decline to substitute our knowledge of estimating coal reserves as gleaned from reading Bulletin 1450-B for that of Conaway, a seasoned mining veteran well versed in West Virginan coal, whose testimony we found most convincing and who testified that "I feel I know that seam. I've only seen that seam but about 45 locations in an area of about 100 square miles around there," or for that of Gales who testified that the number of outcroppings made by Conaway was sufficient to estimate the amount of proven reserves on the western tract. See p. 41, supra. We are satisfied that Conaway was not, as respondent suggests, merely the handmaiden of Neilan who gave him and through him the partnership the figure that they wanted for the estimated coal reserves. Compare Thomas v. Commissioner,84 T.C. at 1276. With respect to Howard's conclusions which argue against adopting such a view, we comment that
We *649 are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. * * * We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. * * * [Parker v. Commissioner,86 T.C. 547, 561 (1986). Citations omitted.] [17]
*650 Accordingly, we conclude that the reserve estimate figures found in the Conaway reports provided a reliable reflection of the amount of proven, recoverable reserves on the Boone property and that Boone was justified in relying on them. [18]
*651 We are also satisfied that the cost-per-ton figures contained in the Miller report were, as of the end of 1976, a reasonable estimate of the cost of extracting coal from the Boone mine, and, in turn, that the $ 17.00 per ton figure the partnership agreed to pay to Boone Resources pursuant to their contract mining agreement, was reasonably relied upon by the partnership in making its projections. In arriving at this conclusion, we have not attempted to peg with exactitude the precise cost per ton of coal. Rather, we have endeavored, given the plethora of expert testimony with which we were presented, to estimate a reasonable range of cost and decide whether profit projections based upon such a range were reasonable. The Miller report estimated $ 16.00 as the cost per raw ton of mining the Boone coal based on an annual production of 200,000 tons. This amount reflected not only the out-of-pocket cost of extracting the coal from the ground, but also included a $ 2.50 per ton allowance for depreciation. Thus, to arrive at a proper estimate of the out-of-pocket cost of extracting the coal we subtract out this $ 2.50, for a net cash cost of $ 13.50 per raw ton. Moreover, we note that *652 since the Miller report focused only on the cost of extraction it made no provision for the transportation or washing of the coal. [19]
We also heard testimony from Conaway and Gales with respect to the out-of-pocket cost of extracting coal from the Boone mine. [20] Conaway estimated the cost of extraction to be $ 14.59 per ton. To this figure Conaway added a 10 percent addition for unexpected contingencies to arrive at an out-of-pocket cost, net of transportation, of $ 16.05 per ton. [21] However, Conaway's estimates, *653 which were extrapolated at trial from the Howard report, were calculated on a clean ton, as opposed to a raw ton, basis. The Boone promotion, however, was based on the assumption that Boone would sell raw tonnage, and that the purchaser would be responsible for cleaning the coal, i.e., separating out from the coal any rock or other extraneous material which also gets mined during the excavating process -- a process to be distinguished from washing, see note 19, supra. Thus, in computing cost per ton for purposes of our analysis herein we divide total cost by 200,000 raw tons, not the 180,000 clean tons used by Howard and relied upon by Conaway in deriving his estimates. Accordingly, Conaway's clean ton estimate, as adjusted, reflects a cost per raw ton of $ 14.15 ($ 16.05 x .9). Gales estimated the out-of-pocket cost per raw ton of coal, net of transportation, to be $ 17.58. [22] While Gales provided for no contingency amount as stated as a fixed percentage of total cost, he explained at trial that he indeed had provided for contingencies by reducing the efficiency of the labor force by a factor of 25 percent in making his calculations. Accordingly, if we summarize the results *654 reached by the Miller report and by petitioners' experts, we derive a range of cost, net of transportation, between $ 13.50 and $ 17.58 per raw ton. Moreover, although not an expert, Roger Ball ("Ball"), a coal miner and mining equipment dealer, who as of the time of trial had been involved in coal mining for over 18 years, and who in 1976 had been the mine superintendent of the Manila mine on the eastern portion of the 1420 acre tract (see p. 6, supra), testified that looking back to 1976 he considered $ 16 per ton to be a sufficient price for a mining company to profitably extract coal from the Boone site. *655 With this range in mind, we now turn to Howard's estimate of cost per ton. Howard's report estimated the cost per clean ton of coal to be $ 21.88, [23] plus a contingency factor of five percent, bringing the total of $ 22.97 per clean ton, or $ 20.67 per raw ton ($ 22.97 x .9). The record reveals that Howard's higher cost estimate is attributable primarily to his higher estimates of the cost of labor and supplies. With respect to his estimate of the cost of labor, we are convinced, based on the testimony of Conaway, Gales and Ball, that many of the assumptions on which Howard relied, such as the number of laborers needed to run the mine, were incorrect and that he overestimated the total cost attributable to labor at the mine. Similarly, with respect to Howard's estimate of the cost of supplies attributable to the operation and maintenance of the mine, we think Conaway's estimates, which were substantially lower than Howard's and were based on Conaway's comparison of actual costs of similar mines operating in the same general area, were more realistic. *656 Accordingly, we think the $ 17.00 cost per ton agreed to by Boone and Boone Resources under the terms of the contract mining agreement, which was based upon the Miller estimate, fell within a reasonable range of cost given the facts and circumstances that existed in 1976. While we recognize that the range discussed above does not include any amount attributable to transporting the coal, it does not seem that the addition of hauling costs would have adversely affected Boone's or Boone Resources' profit potential. Neilan testified that it was initially estimated that hauling charges would cost Boone Resources somewhere between $ .60 and $ 1.00 per ton, based upon the standards in the industry at the time. We see no reason to question Neilan's figures, especially in the absence of any conflicting evidence put forth by respondent as to the going rate for hauling coal during the time frame herein at issue. [24] Thus, we conclude that, in 1976, the total cost of mining a raw ton of coal, including a $ 1.00 charge per ton for transportation, lay in a range between $ 14.50 and $ 18.58, which embraces the $ 17.00 figure agreed to in the contract mining agreement. Accordingly, we find that *657 the cost assumptions relied upon by the partnership in this respect, in preparing the projections found in the private placement memorandum, were reasonble and accurately reflected the potential actual costs of the project. See also note 21, supra.
*658 Finally, we address, and reject, respondent's contention that Boone Resources was undercapitalized. The Miller report estimated that the total initial capital required to get the Boone mine underway would be $ 550,000, comprised of $ 145,000 for equipment and the balance for working capital. The $ 145,000 attributable to equipment reflected the full purchase price in cash of certain equipment and the payment of a 20 percent down payment on other equipment with the balance of payments to be made on a monthly lease-purchase rate. The report also provided that in July, 1978, an additional section of equipment would be needed that would require the infusion of another $ 420,000 of capital funds. Based on these estimates, Boone Resources was initially capitalized with $ 500,000. Howard, in contrast, estimated that the capital cost of opening the Boone mine was $ 2,480,775, and respondent, seizing upon this estimate, claims that Boone Resources was grossly undercapitalized. We disagree. To begin with, Howard, in arriving at his estimates, incorrectly assumed that Boone Resources would purchase all its equipment for cash and not acquire any of it by lease. Accordingly, it is necessary, *659 as Gales did at trial, to recalculate Howard's capital estimates assuming that a portion of the mine equipment was leased under terms similar to those found in the Miller report. Gales concluded that, after such an adjustment, the total capital required to start up the mine was $ 1,167,400. [25] Moreover, Howard's total assumed that capital would initially be required for equipment for both sections of the mine. Miller, on the other hand, was only concerned with the capital required to start up the first section of the mine. We agree with Miller's approach. We accept Ball's explanation that, in determining Boone Resources' capital needs, it should have been assumed that the company would be "rolling on its own capital" in order to come up with the additional $ 420,000 necessary for the second section of equipment, i.e., the cash flow generated from the coal mined and sold through July, 1978, (projected at over 200,000 tons) would serve as the source of the additional capital. [26] We think it was unrealistic from an economic standpoint for Howard to assume that up-front capital was necessary to finance the second section of the mine which was not contemplated to come on line until *660 some 18 months later. As a result, assuming, as the Miller report did, that approximately 43 percent of the total costs for the two sections are attributable to the second section only ($ 420,000/970,000), we are left with approximately $ 665,000 of capital costs attributable to the start up of the mine. While we recognize that this number still exceeds the $ 550,000 provided for in the Miller report, we think it is too close to support a finding that the Miller estimate was so unrealistic that it should not have been relied upon by the partnership. In this regard, we found it significant that Ball, who was superintendent of the Manila mine on the eastern tract, which was a similar type of mining operation, testified that he considered $ 450,000 to $ 600,000 to be the amount of capital necessary to get the Boone mine operation underway. *661 Accordingly, in view of our acceptance of the estimates contained in the Conaway and Miller reports, we proceed with our profit-objective analysis by focusing on the financial projections found in the Boone private placement memorandum which were derived therefrom. As the table on p. 21, supra, reflects, assuming a 50 percent tax bracket [27] and that the partnership would be entitled to deduct the entire advanced royalty in 1976, a limited partner investor stood to receive in before-tax dollars $ 88,464 over a ten-year period ($ 138,464 minus $ 50,000) above his cash investment of $ 50,000. Moreover, as the table on p. 21, supra, also reveals, the cash flow produced by the tax savings would have amounted to only $ 22,629 ($ 161,093 minus $ 138,464). Thus, in the instant case, there is not the substantial disparity between the projected net tax benefits and the cash-on-cash return which existed in Estate of Baron v. Commissioner (see 83 T.C. at 558-559). In fact, the situation herein is quite different from that which existed in Estate of Baron, where the tax benefit was substantially in excess of the cash invested. In the instant case, the reverse *662 situation exists in that the $ 50,000 cash invested by each partner is in excess of the tax benefit of $ 22,629. This excess is a further indication that tax benefits were not a primary objective of the partnership. If we take the analysis one step further and assume, as the partnership did in the table on p. 23, supra, that the advanced royalty deductions would have to be taken pro rata over the term of the investment, then the 50-percent taxpayer would find himself in an even less favorable position. Another comparison reveals that, the $ 76,544 cash flow from the deduction of the advanced royalty in 1976 is less than one-half of the cumulative cash flow and net after-tax savings of $ 161,093 ($ 138,464 plus $ 22,629).[28] Even if we *663 focus our attention on the $ 26,544 profit accruing in the first year from the anticipated deduction of the advanced royalty ($ 76,544 minus $ 50,000), we cannot find a significant disparity since this amount is far less than the anticipated profit of $ 84,549 after taxes during the years 1977 through 1985 ($ 161,093 minus $ 76,544).[29] In short, the bulk of the anticipated profit was expected to come from the mining operations rather than the tax savings. Compared Estate of Baron v. Commissioner, supra at 558-559. See also Taube v. Commissioner,88 T.C. at 483-484; Waddell v. Commissioner,86 T.C. 848, 894 (1986). [30]
*664 We have no doubt that tax considerations were an element -- perhaps a significant element, particularly in respect to the immediate savings from the write-off of the $ 5,025,000 advance royalty in 1976 -- in the partnership's decision to engage in the transaction involved herein, but, based upon our evaluation of the entire record, we are satisfied that such considerations were not the primary objective of any such investment decision. Moreover, as might be gleaned from our favorable analysis with respect to the Miller and Conaway reports, we are satisfied that the Boone promoters, despite their lack of expertise with respect to mining domestic coal, "produced sufficient advice and made sufficient inquiries to make a reasonable determination as to whether the [Boone promotion] would be a profitable venture." Taube v. Commissioner, supra at 481. Furthermore, unlike the situation in Seaman v. Commissioner,84 T.C. at 590-591, not only had the services of Miller and Conaway already been engaged prior to the signing of the sublease agreement, but their reports had been completed, reviewed and relied upon by Guthrie and the Boone promoters precedent *665 to entering into the transaction. This was not, as it was found to be in Seaman, a case of "putting the horse before the cart." 84 T.C. at 590. [31]
*666 Finally, we do not consider the differential in the amounts paid by LJP ($ 800,000) and Boone ($ 5,025,000) as advanced royalties to require a conclusion that a profit objective did not exist. The situation herein is unlike that which existed in Seaman v. Commissioner, supra, or Thomas v. Commissioner, supra, in which we concluded that a disproportionately large advanced royalty required to be paid by a sublessor partnership to a lessor akin to LJP could only be explained under the facts of that case as a means of inflating the deductions for the limited partners (84 T.C. at 593-594 and 1280). To begin with, we are satisfied that the $ 5,025,000 advanced royalty amount agreed to in the sublease was reasonable determined and is supported by the record herein. Landesman testified that it was ascertained that the probable selling price of the coal would be between $ 25.00 and $ 30.00 per ton, [32] and that it was determined that an amount constituting slightly less than 10 percent of this price, i.e., $ 2.50 per ton, was considered to be commercially reasonable as a royalty. Accordingly, based on the assumption that 2,000,000 tons of coal *667 would be extracted and sold over the course of the investment, an assumption which we have already found is supported by Conaway's estimate, it was calculated that the amount of the advanced royalty could reasonably be estimated at approximately $ 5,000,000 ($ 2.50 x 2,000,000). We think this was a sound analysis. [33] Furthermore, as Landesman explained at trial and, as the record reveals, Neilan's agreement to accept the $ 800,000 advance royalty was conditioned on, and must be viewed in light of, the fact that Neilan, through Boone Resources, expected to earn a per-ton profit as contract miner in addition to the per-ton royalty he expected to receive under the lease agreement. Thus, while at first glance it appears that LJP cut a better deal than Neilan due to the wide disparity between the amounts to be received by each in advanced royalties, we see that this was simply not the case when the venture is viewed in its entirety since the contract mining agreement reveals that Boone Resources expected that as contract miner it would reap an additional profit of $ 3.00 per ton. *668 The long and the short of the matter is that we are convinced that Boone initially entered into the venture with a bona fide objective to make a profit, only to be undone by subsequent and changing circumstances, many of which were not within its control, and which transformed the project into an unprofitable investment. Most notably, unforeseen difficulties were encountered in constructing the hauling road which prematurely exhausted the majority of Boone Resources' initial capital and delayed the opening of the mine. Moreover, while it appears that the mine workers' strike did not have a measurable effect on the mine's development, we think it clear from the record that the fatality at the mine had a deleterious effect on the mine's operations. Furthermore, by the time the mine was finally producing, the great demand for coal, which had been spurred on by the onset of the energy crisis in 1973, had begun to decline as the crisis subsided, causing the price of coal to fall. At the same time, the cost of production increased because, as the need for coal as an energy source declined, environmental standards became much stricter necessitating the washing of the coal so that it *669 could be merchantable. Thus, Boone's profit picture had become quite bleak by 1978. As the private placement memorandum had made quite clear, investment in Boone was a venture frought with risk, conceived with only a small financial margin of error. Unfortunately for its investors, the Boone offering became a self-fulfilling prophecy. Nonetheless, no matter how risky the investment was and despite its eventual failure, we think the underlying objective of the venture was, from its inception, to make a profit. In view of the foregoing, we hold that petitioners have carried their burden of proving that the partnership had a bona fide profit objective aside from the tax benefits which inured from the project. [34]
*670 We now turn to the question of the amount of the the advanced royalty deduction to which Boone is entitled. Prior to October 29, 1976, section 1.612-3(b)(3), Income Tax Regs., provided in pertinent part, that The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows: (i) As deductions from gross income for the year the advanced royalties are paid or accrued * * * [Emphasis added.]
However, on October 29, 1976, the Internal Revenue Service published News Release IR-1687 announcing proposed amendments to section 1.612-3(b), Income Tax Regs., effective as of such date. The effect of these amendments, as it concerns this case, was henceforth to preclude the deduction of advanced royalty payments in years in which no minerals are actually sold, or produced in the case of minerals sold prior to production. See section 1.612-3(b)(3), Income Tax Regs., as amended. [35]
*671 However, the amended regulation provided, in pertinent part, that
the amendment will not apply if prior to October 29, 1976 (i) the payment of the advanced royalties was required pursuant to a mineral lease which was binding upon the party who in fact pays or accrues such royalties, * * * [T.D. 7523, 1978-1 C.B. 192, 193.]
In Zegeer v. Commissioner,T.C. Memo. 1984-587, we held that the sublease agreement entered into between Boone and LJP constituted such a binding obligation. As a result, we concluded that the amended regulation was not applicable to the Boone deduction. Respondent, in turn, filed a motion for us to reconsider our decision therein, which we subsequently denied pursuant to an order and memorandum sur order dated January 3, 1985. Respondent asks us to reconsider our prior stance in light of the evidence adduced at trial and find that no binding objection existed between Boone and LJP as a result of the October 27, 1976 sublease. Unfortunately for respondent, and after careful review of such evidence, our view remains unchanged; we consider the October 27, 1976 sublease to constitute a binding obligation between LJP and *672 Boone. Accordingly, the allowable amount of Boone's deduction with respect to the advanced royalty payments must be determined pursuant to the regulation as it existed prior to amendment (the "old" regulation). It is from this point that we now proceed. [36]
Notwithstanding the fact that the partnership qualifies for treatment under the old regulation, we conclude that it is not entitled to the full amount of the deduction claimed on its 1976 partnership return. To begin with, we consider the payment by Boone of the nonrecourse note as being so speculative and contingent as to preclude the accrual by the partnership of the $ 3,500,000 portion of the advanced royalty which was secured by it. As we stated in Vastola v. Commissioner,84 T.C. 969, 977 (1985),
It is well established that the proper year of deduction for an accrual-method taxpayer is "the *673 taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs.; see Thor Power Tool Co. v. Commissioner,439 U.S. 522, 543 (1979); Burlington Northern Railroad Co. v. Commissioner,82 T.C. 143, 146-147 (1984); see also Pub. L. 98-369, sec. 91(a), 98 Stat. 598-600 (1984) (adding Code section 461(h)(4), effective as to deductions allowable after July 18, 1984). It is also well established that contingent liabilities may not be accrued and deducted while they are still contingent. Security Flour Mills Co. v. Commissioner,321 U.S. 281, 284 (1944); Bennett Paper Corp. v. Commissioner,78 T.C. 458, 470 (1982) affd. 699 F.2d 450 (8th Cir. 1983). Just as nonrecourse notes upon which payment is wholly contingent on production are so illusory as to be "inherently inconsistent with the regulatory definition of a minimum royalty provision" (Maddrix v. Commissioner, supra at 623), such notes are also so illusory as to fail to establish all the events necessary to determine *674 the fact of liability. Brountas v. Commissioner,692 F.2d 152, 161 (1st Cir. 1982), and CRC Corp. v. Commissioner,693 F.2d 281, 283 (3d Cir. 1982, vacating and remanding on other grounds 73 T.C. 491 (1979); Gibson Products Co. v. United States,637 F.2d 1041, 1047-1049 (5th Cir. 1981). In the words of the Court of Appeals for the Fifth Circuit, a "true lending transaction," and thus a true liability, requires "'a reasonable basis for the prediction that the ability of the borrower to repay will not be wholly or substantially contingent upon the success or failure of the business venture.'" Gibson Products Co. v. United States, supra at 1047; citation omitted. [Footnote reference omitted.] In the instant case, as in Vastola, it is clear that payment of the nonrecourse note was wholly contingent on production. Simply put, review of the record herein leaves no doubt that the note would, and could, be paid only if the mine was productive and generated a sufficient cash flow. Moreover, while we have determined that, for purposes of ascertaining whether the partnership had a bona fide objective of *675 making profit, recoverable reserves existed on the land and that it was indeed possible that they could be economically recovered and sold by the partnership, we think payment of the note must be considered too speculative and contingent to justify accrual of the advanced royalty liability, given the fact that the inherent risks in the project were so great that the actual extraction and sale of these reserves so as to pay of the note were far from certain. See Vastola v. Commissioner, supra at 978. Accordingly, under such circumstances, we hold that accrual by the partnership of the portion of the advanced royalty secured by the nonrecourse note would be improper since "as a matter of law * * * all the events necessary to establish liability on the notes * * * did not occur during the years in issue." Vastola v. Commissioner, supra at 979. Thus, the partnership's deduction, to the extent we determine it to be allowable, may not exceed the cash portion of the advanced royalty. Furthermore, we conclude that, even under the old regulation, [37] the partnership is not entitled to deduct as an advanced royalty in 1976 the full amount of the cash *676 paid to LJP. As we commented in Seaman v. Commissioner,84 T.C. at 587,
We think it also important to note that it is exceedingly doubtful that the old regulation permitted the deduction of lump-sum advanced royalty payments. See Redhouse v. Commissioner,728 F.2d 1249, 1251 (9th Cir. 1984); Wendland v. Commissioner,79 T.C. 355, 385 (1982), affd. 739 F.2d 580 (11th Cir. 1984), affd. sub nom. Redhouse v. Commissioner, supra. Such a deduction would be not only inconsistent with the language of the old regulation, specifying that the advance royalties were required to be paid, "annually," but also contrary to the well-entrenched principle of tax accounting that a payment that creates an asset having a useful life that extends substantially beyond the close of the taxable year must be deducted over the years to which the payments relates. See, e.g., sec. 1.461-1(a)(2), Income Tax Regs.; Commissioner v. Bolyston Market Association,131 F.2d 966 (1st Cir. 1942); Baton Coal Co. v. Commissioner,51 F.2d 469 (3d Cir. 1931), cert denied 284 U.S. 674 (1931); *677 University Properties, Inc. v. Commissioner,45 T.C. 416 (1966), affd. 378 F.2d 83 (9th Cir. 1967). * * * [Footnote reference omitted.] [38]
In line with this reasoning, [39] we hold that Boone must amortize the cash portion of the advanced royalty payment over the term of the sublease, *678 i.e., 10 years. See section 1.167(a)-1 and (a)-3, Income Tax Regs. Thus, we find that Boone is entitled to a claimed annual deduction of $ 152,500 ($ 1,525,000/10). Accordingly, since the sublease was not entered into until October 27, 1976, Boone's deduction for the 1976 taxable year is limited to approximately $ 25,000 -- the exact amount to be determined pursuant to a computation under Rule 155. See section 1.167(a)-10(b), Income Tax Regs.[40]
*679 The next issue for decision is whether Boone is entitled to the $ 210,000 interest deduction taken with respect to the nonrecourse note, which was accrued by the partnership but not paid in 1977. Under the same rationale which led us to the conclusion that payment of the nonrecourse note was too speculative and contingent to justify accrual of the non-cash portion of the advanced royalty liability, see pp. 64-66, supra, we hold that the partnership is not entitled to the accrued interest deduction it claimed in 1977 which flowed therefrom. Moreover, we note that, by the end of 1977, payment of the note had become even more speculative, given the facts that mining had still not commenced, that Boone's capital base was quickly eroding and that the partnership had failed to make even the required minimum quarterly payments on the note during the year. See p. 29, supra.
We next address whether in 1981 Boone should recognize gain as a result of the foreclosure on the deed of trust, see p. 32, supra, and, if so, whether such gain should be categorized as ordinary or capital in nature. On its 1981 return, Boone reported a $ 4,482,500 capital gain, attributable to the discharge *680 of its liabilities with respect to the venture, calculated as follows: Nonrecourse note
$ 3,500,000
Accrued interest
980,000
Misc. accrued expense
2,500
Total
$ 4,482,500
As noted at p. 33, supra, petitioners did not report their distributive share of such income on their 1981 return. [41] Respondent argues only that Boone must include in income gain with respect to the discharge of these liabilities to the extent that we determine that the partnership is allowed deductions with respect to these amounts in 1976 and 1977. [42] Since we have determined that Boone is not entitled to its claimed deductions with respect to the non-cash portion of its accrued advance royalty obligation or the interest it accrued on the nonrecourse note, we hold that Boone recognized no gain as a result of the events that occurred in 1981. [43] Accordingly, we hold, that petitioners are not liable for any taxes on their distributive share of such amounts, or for the additions to tax under section 6653(a)(1) and (2) for their failure to report this income in 1981. [44]
*681 Finally, we hold that, in view of our finding that the partnership's activities constituted an activity engaged in for profit under section 183, there is not substantial underpayment in this case arising from a tax-motivated transaction. Accordingly, with respect to interest on the underpayments which has accrued after December 31, 1984, we find that petitioners are not liable for the increased rate of interest under section 6621. To reflect the foregoing, Decisions will be entered under Rule 155.
APPENDIX A
Lists of checks drawn on Southwest Enterprises' accounts which were used for the personal benefit of petitioners. 1974
Date of
Check
Payee
Amount
07/03/74
GNI-Cal.
$ 13,000.00
07/26/74
GNI-Cal.
950.00
10/17/74
GNI-Cal.
350.00
11/01/74
GNI-Cal.
200.00
11/18/74
GNI-Cal.
232.50
12/03/74
GNI-Cal.
600.00
12/13/74
GNI-Cal.
305.00
Total to GNI-Cal.
$ 15,637.50
1974
Date of
Check
Payee
Amount
03/28/74
M. Olken
$  5,000.00
04/03/74
M. Olken
6,000.00
04/09/74
M. Olken
20.03
04/25/74
M. Olken
450.00
05/24/74
M. Olken
9,000.00
07/09/74
M. Olken
507.83
07/30/74
M. Olken
185.00
11/11/74
M. Olken
127.60
12/18/74
M. Olken
78.80
Total to M. Olken
$ 21,369.26
*682 1974
Date of
Check
Payee
Amount
08/07/74
16200 Building
$   250
09/  /74
16200 Building
250
11/24/74
16200 Building
250
12/05/74
16200 Building
250
12/05/74
16200 Building
250
Total to 16200 Building
$ 1,250
1974
Date of
Check
Payee
Amount
8/13/74
Esther Olken
$ 146.65
8/23/74
Esther Olken
37.53
9/12/74
Esther Olken
36.40
9/27/74
Esther Olken
218.40
Total to Esther Olken
$ 438.98
6/27/74
Conejo Valley
Veterinary Clinic
$  40.00
1974
Date of
Check
Payee
Amount
4/15/74
Ashley Co.
$ 10,000.00
4/22/74
Ashley Co.
5,000.00
4/26/74
Ashley Co.
11,000.00
5/24/74
Ashley Co.
301.98
7/02/74
Ashley Co.
4,550.00
7/05/74
Ashley Co.
5,500.00
7/16/74
Ashley Co.
3,000.00
7/29/74
Ashley Co.
2,000.00
Total to Ashley Co.
$ 41,351.98
1974
Date of
Check
Payee
Amount
8/09/74
Cash
$ 350
8/15/74
Cash
50
Total
$ 400
1974
Date of
Check
Payee
Amount
10/10/74
Crestview Escrow, Inc.
$ 7,032
12/13/74
Crestview Escrow, Inc.
500
Total
$ 7,532
1974
Date of
Check
Payee
Amount
8/09/74
Mark Hayworth
$  1,000
8/20/74
Mark Hayworth
1,800
8/20/74
Mark Hayworth
2,000
9/20/74
Bank of America
6,350
Total to Mark Hayworth
$ 11,150
*683 1974
Date of
Check
Payee
Amount
10/05/74
Carwell Corp.
$   515.21
11/05/74
GMAC
* 147.00
11/06/74
Cenval Leasing
210.16
12/20/74
GMAC
* 147.00
Total to Leasing Companies
$ 1,019.37
1974
Date of
Check
Payee
Amount
04/19/74
Mobil Oil Corp.
$    81.75
05/09/74
Mobil Oil Corp.
276.52
06/13/74
Mobil Oil Corp.
254.50
07/18/74
Mobil Oil Corp.
113.17
09/07/74
Mobil Oil Corp.
57.89
11/06/74
Mobil Oil Corp.
179.49
03/01/74
Standard Oil
10.00
05/29/74
Standard Oil
97.65
07/19/74
Standard Oil
52.15
10/07/74
Standard Oil
122.54
11/06/74
Standard Oil
45.11
Total Paid to Oil Companies
* $ 1,290.77
1974
Date of
Check
Payee
Amount
10/07/74
Bank Americard
$   132.47
11/06/74
Bank Americard
660.14
04/04/74
Master Charge
225.23
05/31/74
Master Charge
568.14
06/17/74
Wells Fargo Bank
303.65
08/13/74
Wells Fargo Bank
243.14
Total Payments on Bank Credit Cards
* $ 2,132.77
*684 1974
Date of
Check
Payee
Amount
07/19/74
T.W.A. GetAway
$    82.39
10/07/74
T.W.A. GetAway
100.00
11/06/74
T.W.A. GetAway
155.00
10/25/74
Steve Skynear
20.00
06/13/74
Daniel Yaffe
750.00
09/27/74
Sally Ruth Schoonover
2,000.00
10/02/74
Sally Ruth Schoonover
1,200.00
05/30/74
Western Airlines
117.28
Total Other Miscellaneous Checks
$ 4,424.67
Total withdrawn (embezzled) during 1974 from Southwest Enterprises for nonbusiness payments made on behalf of petitioners:
$ 15,637.50
21,369.26
1,250.00
438.98
40.00
41,351.98
400.00
7,532.00
11,150.00
1,019.37
853.01
2,103.99 4,424.67
$ 107,570.76
1975
Date of
Check
Payee
Amount
2/11/75
M. Olken
$    16.83
2/25/75
M. Olken
10.15
3/06/75
M. Olken
3,000.00
3/15/75
M. Olken
7.50
3/18/75
M. Olken
15.00
3/25/75
M. Olken
300.00
3/28/75
M. Olken
5.00
3/28/75
M. Olken
800.00
4/04/75
M. Olken
24.90
Total to M. Olken
$ 4,179.38
1975
Date of
Check
Payee
Amount
3/8/75
16200 Building
$ 500.00
4/1/75
16200 Building
250.00
Total to 1600 Building
$ 750.00
*685 1975
Date of
Check
Payee
Amount
1/18/75
GMAC
$ 147.00
1/20/75
Cenval Leasing
230.65
3/15/75
E. Olken
12.00
3/26/75
E. Olken
16.00
Total
* $ 405.65
1975
Date of
Check
Payee
Amount
1/20/75
Mobil Oil
$    24.30
3/08/75
Mobil Oil
276.14
4/01/75
Mobil Oil
318.23
1/20/75
Standard Oil
78.31
3/08/75
Standard Oil
205.80
3/08/75
Standard Oil
81.73
4/01/75
Standard Oil
588.84
Total
$ 1,573.35
1975
Date of
Check
Payee
Amount
1/13/75
Bank Americard
$   162.00
3/08/75
Bank Americard
375.00
4/04/75
Bank Americard
150.00
4/04/75
Bank Americard
352.00
3/08/75
Wells Fargo Bank
270.00
3/12/75
Wells Fargo Bank
250.00
4/01/75
Wells Fargo Bank
155.00
Total Payments on Bank Credit Cards
$ 1,714.00
1975
Date of
Check
Payee
Amount
1/20/75
T.W.A.
$    52.85
3/08/75
T.W.A.
118.88
4/01/75
T.W.A.
59.44
4/04/75
T.W.A.
120.00
4/01/75
Franklyn Financial Co.
224.21
3/08/75
City National Bank
243.80
3/08/75
Zenith Life Insurance
101.76
3/26/75
Daisy Publication
4,500.00
Total
$ 5,420.94
*686 Total withdrawn (embezzled) during 1975 from Southwest Enterprises for nonbusiness payments made on behalf of petitioners:
$ 4,179.38
750.00
405.65
1,573.35
1,714.00 5,420.4
$ 14,043.32
APPENDIX B
List of checks embezzled directly fron the Matankys and deposited into an account controlled by petitioner. Date of
Check
Payee
Amount
1/17/74
MOF
$  5,000.00
3/04/74
Rottman Co.
12,000.00
$ 17,000.00
Date of
Check
Payee
Amount
3/18/74
Southwest Enterprises
$  3,250.00
3/19/74
Southwest Enterprises
1,300.00
3/21/74
Southwest Enterprises
1,000.00
3/27/74
Southwest Enterprises
5,000.00
5/06/76
Southwset Enterprises
6,000.00 Total to Southwest Enterprised
$ 16,550.00
Date of
Check
Payee
Amount
3/13/74
16200 Building
$   6,000.00
3/27/74
16200 Building
8,000.00
5/16/74
16200 Building
12,750.00
7/10/74
16200 Building
4,000.00 Total to 16200 Building
$ 30,750.00
1/04/74
M. Olken
$   9,000.00
3/29/74
M. Olken
5,000.00
5/21/74
M. Olken
9,300.00 Total to M. Olken
$ 23,300.00
1/28/74
GNI-Cal.
$   7,500.00
4/08/74
GNI-Cal.
3,250.00
4/12/74
GNI-Cal.
3,500.00
7/03/74
GNI-Cal.
13,000.00 Total to GNI-Cal.
$27,250.00
$ 81,300.00 Total in this Appendix:
$  17,000.00
16,550.00
81,300.00
$ 114,850.00
*687 APPENDIX C
List of checks embezzled by petitioner from M & O Enterprises in 1974 and 1975. 1974
Date of
Check
Payee
Amount
8/19/74
GNI-Cal.
$ 19,000.00
8/28/74
GNI-Cal.
13,000.00
8/29/74
GNI-Cal.
6,000.00
$ 38,000.00
10/05/74
Target Chemical Co.
26.40
10/07/74
Cenval Leasing
436.83
10/07/74
Zenith United Corp.
101.76
10/08/74
Ashley Construction
459.00
10/11/74
Melody Olken
25.65
10/14/74
Smith Bros. Acousticals
90.00
10/15/74
Bob Berk
270.00
10/15/74
Albrite Service
236.00
11/01/74
GNI-Cal.
200.00
11/07/74
M. Olken
41.14
11/11/74
M. Olken
197.40
11/13/74
Tom Ryono
350.00
11/16/74
M. Olken
120.00
11/18/74
GNI-Cal.
232.50
11/20/74
M. Olken
350.00
12/03/74
GNI-Cal.
305.00
12/06/74
City America Ins. Agency
66.00
12/08/74
Stuart Hackel
208.33
12/10/74
16200 Building
3,000.00
12/18/74
M. Olken
25.30
12/20/74
Tom Ryono
250.00
12/28/74
Community Assn.
85.00
12/28/74
Franklyn Financial
213.53
Total for 1974
$ 45,289.84
1974
Date of
Check
Payee
Facts and Explanation
8/19/74
GNI-Cal.
8/28/74
GNI-Cal.
8/29/74
GNI-Cal.
Petitioner untruthfully told
Ms. Schoonover that this
group of checks was his
commission on the
Encino Medical Towers
transaction.
10/05/74
Target Chemical Co.
Chemical for petitioner's
yard.
10/07/74
Cenval Leasing
Lease payment on Mrs. Olken's
Mercedes Benz.
10/07/74
Zenith United Corp.
Life insurance for Mrs. Olken.
10/08/74
Ashley Construction
Interior Decorating of
petitioner's house.
10/11/74
Melody Olken
Payee is petitioner's
daughter.
10/14/74
Smith Bros. Acousticals
Payment for acoustic tiles
for petitioner's friend's
X-rated motel.
10/15/74
Bob Berk
Loan to petitioner's
investment associate.
10/15/74
Albrite Service
Repair of petitioner's
personal television.
11/01/74
GNI-Cal.
Cover overdrafts in
GNI-Cal. account.
11/07/74
M. Olken
11/11/74
M. Olken
11/13/74
Tom Ryono
Petitioner's personal
gardener.
11/16/74
M. Olken
Deposited into Mrs. Olken's
personal checking account.
11/18/74
GNI-Cal.
Cover overdraft in GNI-Cal.
account.
11/20/74
M. Olken
Payment given to Mrs. Olken
each week.
12/03/74
GNI-Cal.
Payment to a GNI-Cal. employee.
12/06/74
City America Ins. Agency
Not a partnership expense.
12/08/74
Stuart Hackel
Repayment of personal loan.
12/10/74
16200 Building
Cover overdraft in 16200
Building account.
12/18/74
M. Olken
12/20/74
Tom Ryono
12/28/74
Community Assn.
Community association
dues for petitioners'
residence.
12/28/74
Franklyn Financial
Nonpartnership expense.
Total for 1974
*688 1975
Date of
Check
Payee
Amount
Facts and Explanation
1/02/75
GNI-Cal.
$    300.00  1/31/75
GNI-Cal.
400.00  2/14/75
GNI-Cal.
870.00  2/28/75
GNI-Cal.
320.00  3/03/75
GNI-Cal.
320.00  3/14/75
GNI-Cal.
200.00  4/03/75
GNI-Cal.
250.00  4/10/75
GNI-Cal.
350.00  5/09/75
GNI-Cal.
650.00  $  3,660.00  The majority of these checks
were drawn to cover overdrafts
in one or another of
petitioner's bank accounts.
1/03/75
Instant Replay
383.00  2/01/75
Instant Replay
200.00  $ 583 was used to purchase a
television for petitioner's
personal use and enjoyment.
On the receipts of purchase,
GNI-Cal. was listed as buyer
of the television.
1/07/75
Stuart Hackel
208.33  Repayment of personal loan.
2/06/75
Kyoka Tochimura
200.00  Payment to petitioner's
personal housekeeper.
2/12/75
GMAC
147.00  Entire payment for lease of
petitioner's daughter's car.
3/07/75
Las Virgenes Water
Payment for water bill for
District
73.88  petitioner's residence.
3/07/75
Cenval Leasing
210.16  Lease payment on Mrs. Olken's
Mercedes Benz.
3/12/75
Wells Fargo Bank
150.00  Payment on petitioner's
personal Master Charge.
3/15/75
Joseph Kaplan
400.00  Repayment of loan to payee,
petitioner's cousin.
3/15/75
City National Bank
233.80  Lease payment on petitioner's
personal Mercedes Benz.
5/09/75
M. Olken
750.00  5/16/75
Esther Olken
120.00  5/25/75
Cash
4,300.00  Total for 1975
$ 11,036.17  *689 APPENDIX D
Listing of rental payments due to M & O Enterprises from tenants in the Encino Medical Towers which were diverted from the partnership and deposited into petitioner's 16200 Building account. Date of
Check or
Deposit Slip
Tenant's Name
Amount
2/08/75
Gootnick
$    369.00
3/06/75
Gootnick
100.00
2/10/75
Saxon
1,325.90
2/10/75
Valley Cardiovascular
486.20
3/07/75
Valley Cardiovascular
565.50
4/07/75
Valley Cardiovascular
565.50
2/07/75
Cocck
110.00
2/07/75
Berez
650.00
2/10/75
Loren
297.85
2/10/75
Burbank-Glendale
234.00
3/07/75
Burbank-Glendale
286.85
4/09/75
Burbank-Glendale
286.85
2/13/75
Destilets
2,000.00
2/20/75
Tower Pharmacy
1,070.59
1/07/75
Stibbins
489.44
2/26/75
Hertz
408.48
3/03/75
Green
331.20
4/02/75
Green
468.00
2/24/75
Grossman
794.50
4/08/75
Grossman
794.50
2/28/75
Goode
574.00
4/02/75
Goode
547.20
3/02/75
Ornstein
304.06
4/04/75
Ornstein
304.06
2/28/75
Hariton & Faust
1,923.18
2/28/75
Hariton & Faust
50.00
3/06/75
BoBell
870.00
4/09/75
BoBell
870.00
3/07/75
Bach
391.00
3/07/75
Pomerantz
50.00
3/07/75
Pomerantz
309.12
3/07/75
Melnich
$    378.12
2/04/75
Kibrick & Miller
1,180.80
3/10/75
Kibrick & Miller
1,242.75
3/11/75
Kibrick & Miller
1,242.75
4/08/75
Kibrick & Miller
1,180.81
4/02/75
Marshall
586.50
4/07/75
Marshall
485.65
4/02/75
Erman
330.00
4/02/75
Goodman
568.12
4/02/75
Skaist
475.50
4/02/75
Jacobson
348.68
2/04/75
Wulfsberg
908.70
4/03/75
Wulfsberg
908.70
4/03/75
Bloom
405.60
3/03/75
Dinolfo
251.35
4/07/75
Birkson
592.20
4/07/75
Indiamer
490.00
4/08/75
Kruuse
400.40
4/09/75
Uthis
600.00
Total
$ 30,430.11
*690 APPENDIX E
List of checks drawn on either VLA, UWIM of GNA accounts to fictitious payees or people or companies doing business with VLA, UWIM or GNA which were deposited into either petitioner's personal account or Mrs. Olken's personal account. 1976
Date of
Check
Payee
Amount
07/14/76
Esther Olken
$ 300.00
07/14/76
Esther Olken
200.00
11/09/76
Esther Olken
150.00
12/10/76
Esther Olken
297.38
$   947.38
11/09/76
Ed. Delaney
286.20
11/11/76
H. Luck
236.28
11/18/76
Hazel Nyshrall
291.60
12/22/76
Robert Goodsell
308.00
* 1,122.08
Total for 1976
(All deposited in Esther
Olken's account at Security
Pacific Bank
$ 2,069.46
1977
Date of
Check
Payee
Amount
01/28/77
Esther Olken
$   939.35
06/17/77
M. Olken
200.00
08/05/77
Morton Olken
125.00
08/15/77
Morton Olkeb
2,000.00
11/10/77
Morton Olken
47.49
$ 3,311.84
(Deposited in Esther Olken's account at Security Pacific Bank). Date of
Check
Payee
Amount
3/03/77
Colony Charter Life
$ 921.52
3/09/77
Colony Charter Life
680.70
3/15/77
Colony Charter Life
965.86
3/18/77
Colony Charter Life
922.38
3/23/77
Colony Charter Life
683.42
3/28/77
Colony Charter Life
437.60
3/30/77
Colony Charter Life
276.24
3/31/77
Colony Charter Life
185.90
4/01/77
Colony Charter Life
235.40
4/08/77
Colony Charter Life
296.71
4/11/77
Colony Charter Life
385.16
4/12/77
Colony Charter Life
268.70
4/18/77
Colony Charter Life
382.60
4/20/77
Colony Charter Life
287.40
4/21/77
Colony Charter Life
257.26
4/27/77
Colony Charter Life
385.25
4/29/77
Colony Charter Life
387.50
5/03/77
Colony Charter Life
389.40
5/05/77
Colony Charter Life
402.60
5/10/77
Colony Charter Life
298.40
5/10/77
Colony Charter Life
223.60
5/16/77
Colony Charter Life
385.60
5/19/77
Colony Charter Life
321.60
5/20/77
Colony Charter Life
385.60
5/24/77
Colony Charter Life
775.80
5/26/77
Colony Charter Life
235.60
5/27/77
Colony Charter Life
384.90
5/31/77
Colony Charter Life
295.60
5/31/77
Colony Charter Life
262.20
6/01/77
Colony Charter Life
233.33
6/03/77
Colony Charter Life
321.60
6/06/77
Colony Charter Life
221.84
6/09/77
Colony Charter Life
329.70
6/10/77
Colony Charter Life
248.70
6/16/77
Colony Charter Life
287.21
6/22/77
Colony Charter Life
361.23
6/24/77
Colony Charter Life
25.59
6/24/77
Colony Charter Life
421.37
6/27/77
Colony Charter Life
245.60
7/15/77
Colony Charter Life
861.70
7/22/77
Colony Charter Life
375.88
8/15/77
Colony Charter Life
225.35
Total to Colony Charter (All deposited in M. Olken's account at Lloyds, endorsements forged by petitioner
$ 16,479.60
*691 Date of
Check
Payee
Amount
08/05/77
Republic Natl. Ins. Co. *
$    215.36
08/09/77
Republic Natl. Ins. Co.
213.80
08/11/77
Republic Natl. Ins. Co.
321.80
08/15/77
Republic Natl. Ins. Co.
386.70
08/18/77
Republic Natl. Ins. Co.
368.70
08/23/77
Republic Natl. Ins. Co.
225.25
08/23/77
Republic Natl. Ins. Co.
175.50
09/01/77
Republic Natl. Ins. Co.
268.70
09/02/77
Republic Natl. Ins. Co.
368.50
09/09/77
Republic Natl. Ins. Co.
267.20
09/09/77
Republic Natl. Ins. Co.
381.60
09/09/77
Republic Natl. Ins. Co.
290.95
09/12/77
Republic Natl. Ins. Co.
278.80
09/15/77
Republic Natl. Ins. Co.
387.90
09/26/77
Republic Natl. Ins. Co.
368.70
09/29/77
Republic Natl. Ins. Co.
325.00
09/30/77
Republic Natl. Ins. Co.
177.25
09/30/77
Republic Natl. Ins. Co.
198.40
10/04/77
Republic Natl. Ins. Co.
410.30
10/06/77
Republic Natl. Ins. Co.
395.85
10/10/77
Republic Natl. Ins. Co.
117.28
10/10/77
Republic Natl. Ins. Co.
285.90
10/10/77
Republic Natl. Ins. Co.
360.60
10/13/77
Republic Natl. Ins. Co.
485.70
10/17/77
Republic Natl. Ins. Co.
410.33
10/19/77
Republic Natl. Ins. Co.
285.60
10/21/77
Republic Natl. Ins. Co.
232.60
10/28/77
Republic Natl. Ins. Co.
372.50
10/24/77
Republic Natl. Ins. Co.
368.70
10/28/77
Republic Natl. Ins. Co.
382.70
11/02/77
Republic Natl. Ins. Co.
398.60
11/04/77
Republic Natl. Ins. Co.
428.70
11/09/77
Republic Natl. Ins. Co.
462.80
11/10/77
Republic Natl. Ins. Co.
321.70
11/17/77
Republic Natl. Ins. Co.
462.80
11/18/77
Republic Natl. Ins. Co.
532.60
11/22/77
Republic Natl. Ins. Co.
681.55
12/01/77
Republic Natl. Ins. Co.
772.80
12/08/77
Republic Natl. Ins. Co.
625.80
12/09/77
Republic Natl. Ins. Co.
732.80
12/13/77
Republic Natl. Ins. Co.
535.20
12/15/77
Republic Natl. Ins. Co.
490.21
12/21/77
Republic Natl. Ins. Co.
382.55
12/23/77
Republic Natl. Ins. Co.
631.70
12/29/77
Republic Natl. Ins. Co.
635.50
12/30/77
Republic Natl. Ins. Co.
677.20
Total to Republic Natl. Life Ins. Co. (All deposited to M. Olken's account at Lloyds, endorsements forged by petitioner)
$ 18,100.48
*692 Date of
Check
Payee
Amount
11/18/77
Director's Life Ins. Co.
394.70
12/02/77
Director's Life Ins. Co.
475.70
12/08/77
Director's Life Ins. Co.
365.70
12/13/77
Director's Life Ins. Co.
324.60
12/15/77
Director's Life Ins. Co.
381.70
12/21/77
Director's Life Ins. Co.
421.70
12/23/77
Director's Life Ins. Co.
367.36
12/30/77
Director's Life Ins. Co.
387.20
Total to Director's Life Ins. Co. (All deposited to M. Olken's account at Lloyds, all endorsement forged by petitioner.)
$ 3,118.66
Date of
Check
Payee
Amount
09/26/77
Tex Ritter
330.20
09/26/77
Tex Ritter
251.30
10/04/77
Tex Ritter
325.00
10/04/77
Tex Ritter
325.00
10/17/77
Tex Ritter
465.00
10/24/77
Tex Ritter
350.00
11/02/77
Tex Ritter
350.00
11/22/77
Tex Ritter
350.00
11/25/77
Tex Ritter
350.00
12/23/77
Tex Ritter
300.00
12/23/77
Tex Ritter
275.00
Total to Tex Ritter (All deposited to M. Olken's account at Lloyd's, all endorsements forged by petitioner)
$ 4,021.50
*693 Date of
Check
Payee
Amount
08/26/77
Barry Resnick
$   250.00
08/26/77
Barry Resnick
500.00
09/15/77
Barry Resnick
375.00
09/20/77
Barry Resnick
350.00
09/29/77
Barry Resnick
325.00
10/06/77
Barry Resnick
325.00
10/13/77
Barry Resnick
250.00
10/13/77
Barry Resnick
250.00
10/17/77
Barry Resnick
300.00
11/10/77
Barry Resnick
350.00
Total to Barry Resnick (All deposited to M. Olken's account at Lloyd's, all endorsements forged by petitioner)
$ 3,275.00
Date of
Check
Payee
Amount
08/26/77
A. S. Hansen
$   500.00
09/20/77
A. S. Hansen
425.00
09/29/77
A. S. Hansen
350.00
10/06/77
A. S. Hansen
350.00
11/10/77
A. S. Hansen
350.00
12/01/77
A. S. Hansen
400.00
12/08/77
A. S. Hansen
350.00
12/13/77
A. S. Hansen
250.00
Total to A. S. Hansen (All deposited to M. Olken's account at Lloyd's, all endorsements forged by petitioner)
$ 2,975.00
Date of
Check
Payee
Amount
11/04/77
California Travelers
Life Ins. Co.
$ 2,250.00
11/04/77
California Travelers
Life Ins. Co.
2,250.00
11/04/77
California Travelers
Life Ins. Co.
2,250.00
Total to California Travelers (All deposited to M. Olken's account at Lloyd's, all endorsements forged by petitioner)
$ 6,750.00
*694 Date of
Check
Payee
Amount
1/24/77
Eddie Vivenzi
$   348.60
1/24/77
Ted Sherrill
144.56
2/23/77
Julia White
317.09
2/23/77
Rosalie Rose
132.50
4/08/77
Bill Norman
15.00
4/08/77
Lou Z. Olken
30.76
5/27/77
Mark Hoffman
12.50
5/27/77
Mark Hoffman
12.50
6/24/77
Ritchie & Ritchie
178.54
(All deposited to M. Olken's account at Lloyd's, all endorsements forged by petitioner)
$ 1,192.05
Date of
Check
Payee
Amount
06/06/77
Harold Mezger
$   267.70
06/08/77
Harold Mezger
285.60
06/09/77
Joe Weller
278.20
06/10/77
Joe Weller
178.60
07/08/77
Harold Mezger
264.70
07/21/77
Harold Mezger
310.25
07/27/77
Harold Mezger
233.70
08/24/77
Harold Mezger
210.86
08/30/77
George Blair
675.00
08/30/77
Harold Mezger
178.20
08/30/77
Victor Lundin
392.00
09/07/77
Joe Weller
41.28
09/20/77
George Blair
327.85
09/15/77
Dr. R. Sibson
250.00
10/13/77
Dr. R. Sibson
325.00
10/19/77
Dr. R. Sibson
225.00
11/02/77
Dr. R. Sibson
250.00
11/11/77
George Blair
275.00
11/17/77
V. R. Lundin
380.90
11/18/77
Dr. R. Sibson
285.00
12/08/77
Dr. R. Sibson
250.00
(All deposited to M. Olken's account at Lloyds)
* $ 5,884.84
*695 APPENDIX F
List of checks paid by some unrelated entity to either V. R. Lundin, one of his companies, or an insured individual, but deposited into petitioners' accounts. 1976
Date of
Check
Payee
Amount
Relevant Facts
10/26/76
V. Lundin
$  13.80
Petitioner had no authority to
endorse Lundin's signature
11/05/76
V. Lundin
20.93
Total 1976
$  34.73 1977
Date of
Check
Payee
Amount
Relevant Facts
01/21/77
V. Lundin
$   360.65  Colony Charter Life
02/28/77
Frank Davis
42.48  Refund from Colorny
Charter Life
02/28/77
Charles Reed
110.47  Refund from Colony
Charter Life
02/28/77
Charles Golden
5.00  Refund from Colony
Charter Life
02/28/77
V. Lundin
137.01  Colony Charter Life
03/01/77
V. Lundin
142.50  Health Plan Trust
Account
03/21/77
Dorothy Benner
15.80  Refund from Colony
Charter Life
03/28/77
Jack Kiester
24.10  Refund from Colony
Charter Life
04/11/77
V. Lundin & Assoc.
57.44  Constitution Life
Ins. Co.
04/27/77
Nila Schwartz
27.81  Refund from Colony
Charter Life
05/05/77
Frances Crandell
17.55  Refund from Colony
Charter Life
05/19/77
Victor Lundin
608.48  Colony Charter Life
05/19/77
Andrew Karatsonyi
26.63  Refund from Colony
Charter Life
05/23/77
Southwest Engineering
155.70  05/25/77
V. Lundin
149.69  Payment from Colony's
commission account
06/17/77
Hollywood West Hospital
19.03  Payment from Colony
Charter Life
06/17/77
Hollywood West Hospital
10.06  Payment from Colony
Charter Life
06/24/77
Hollywood West Hospital
83.86  Payment to hospital by
Colony
06/28/77
Hollywood West Hospital
131.49  Payment to hospital by
Colony
06/28/77
Southwest Engineering
8.00  Payment from Colony
Charter Life
07/05/77
Lawrence Adams
13.40  Refund from Colony
Charter Life
07/05/77
Jean Ealhn
9.08  Premium refund Colony
Charter
07/05/77
Frances Fradelis
10.49  Premium refund Colony
Charter
07/05/77
Mildred Terry
10.46  Premium refund Colony
Charter
07/05/77
E. Evans
3.41  Premium refund Colony
Charter
07/05/77
Wilson Duncan
3.74  Premium refund Colony
Charter
07/05/77
Nancy Davenport
2.17  Premium refund Colony
Charter
07/05/77
Connie Conrey
1.55  Premium refund from
Colony Life
07/05/77
Leo Alvord
5.82  Premium refund from
Colony Life
07/06/77
E. Stout
17.88  Premium refund Colony
Charter
07/14/77
V. Lundin
101.35  California Vision
Service Plan
07/21/77
V. Lundin & Assoc.
94.98  Constitution Life
Ins. Co.
08/01/77
Southwest Engineering
77.85  Payment from Colony
Charter Life
08/02/77
Southwest Engineering
121.92  Payment from Colony
Charter Life
08/10/77
Victor Lundin
32.90  Lone Star Life Ins. Co.
08/11/77
Victor Lundin
65.35  Constitution Life
Ins. Co.
08/15/77
Southwest Engineering
77.95  Payment from Colony
Charter Life
08/16/77
Southwest Engineering
.62  Payment from Colony
Charter Life
08/16/77
Hollywood West Hospital
20.01  Payment from Colony
Charter Life
08/25/77
V. Lundin
105.19  California Vision
Service Plan
08/26/77
Victor Lundin
61.38  Lone Star Life Ins. Co.
08/30/77
V. R. Lundin
22.50  Health Care Plan
09/01/77
Victor Lundin
42.50  Health Plan Trust
Account
09/07/77
Joe Weller
41.28  09/28/77
Southwest Engineering
77.85  Payment from Colony
Charter Life
10/22/77
V. R. Lundin
104.67  Constitution Life
Ins. Co.
11/07/77
Victor Lundin
161.32  Payment from Colony
Charter Life
Total for 1977
$ 3,421.37  *696 Footnotes
1. By order dated September 9, 1985, these cases were consolidated for trial, briefing and opinion. ↩
2. Neilan, however, acquired certain surface mining rights as well in November, 1976. See p. 13, infra.↩
3. Neilan and LJP relied on the Miller report in determining that the $ 500,000 was adequate to capitalize the mining operation. ↩
4. Since, under the percentage method, the annual allowance for depletion is equal to 10 percent of gross income from the property, net of royalties, and limited to 50 percent of taxable income (before deduction for depletion) from the property, Boone's projected annual depletion allowance was also affected by this change in treatment of the advanced royalty. See sec. 613. All section references are to the Internal Revenue Code in effect during the years in issue. ↩
5. We note that there is some confusion in the record with respect to some of the figures and contractual terms set out in this and the preceding paragraph. Accordingly, where discrepancies were found to exist, we have adopted respondent's requested findings of fact, to which petitioners offered no objections. ↩
6. All section references are to the Internal Revenue Code in effect during the years in issue, and all rule references are to Tax Court Rules of Practice and Procedure. Sec. 183(a) provides that if an "activity is not engaged into for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Sec. 183(c) defines an "activity not engaged into for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." ↩
7. Respondent does argue, however, that, even if we find that a requisite objective does exist, the partnership is not entitled to the full amount of its claimed deduction with respect to the advanced royalty. See pp. 62-68, infra.↩
8. Conaway also estimated that there were an additional 168,000 tons of potentially recoverable coal located in the Peerless seam under the category of "probable" instead of "proved" reserves, bringing the total amount of recoverable coal located in the two seams to 2,765,000 tons. However, for purposes of our analysis herein, we have disregarded this extra tonnage as being too speculative to have been properly included in any estimate of the reserve potential of the Peerless seam. See pp. 44-46, infra↩ for a discussion of "proved" reserves. 9. Conaway estimated the total amount of proved tons-in-place in the two seams to be 4,236,000 comprised of 4,012,000 tons recoverable by underground mining techniques and 224,000 tons recoverable by surface mining techniques. These were gross tonnage figures which were then reduced by recovery factors of 60 and 85 percent, respectively, to arrive at the net figure of 2,597,000 recoverable tons of coal. ↩
10. We note that the actual outcropping of the seams was done by Lunking and Neilan. However, the sites to be outcropped were chosen by Conaway and the technical measurements with respect to the seam thicknesses and the measured estimates of the elevation of the seams above sea level were taken only by Conaway or one of his staff engineers. Accordingly, while the prospecting of the land was in part accomplished by Neilan and Lunking, it is clear that the overall investigation was conducted under the careful direction and supervision of Conaway. ↩
11. Making a measured outcrop exposure consists simply of digging into the hillside until the coal seam is exposed, and then in turn taking a measurement of the seam's height. Conaway testified that the average size of the outcrops made on the Boone property measured between three to five feet in diameter. ↩
12. Although the Alma seam was not the subject of the revised Conaway report (see p. 6, supra↩) and was not used as a basis for the projections found in the private placement memorandum, we note that Conaway estimated this seam thickness to average 40 inches in height. 13. We note here, at the beginning of our analysis of the various expert reports, that respondent has tried to make much of the fact that the names by which Conaway referred to each of the seams differed from those found on the geological survey maps. While there is some evidence to support such a view, we think that record clearly reveals that the parties involved in these transactions understood exactly which seams they were bargaining for and were quite aware of the respective estimated tonnages and quality of coal in each of these seams, regardless of what they were called. Accordingly, as long as Conaway's references to the different seams were consistent, which we believe is the case, the fact that he referred to them by different names we find not to be relevant to our decision herein. ↩
14. We note that respondent has not always been critical of Conaway's expertise. See Seaman v. Commissioner,84 T.C. 564, 591-592 (1985). Similarly, we are not impressed with respondent's efforts to discredit Boone's use of the Conaway reports on the ground that Neilan, the owner of the property, obtained them. Respondent's reliance in this regard, on Seaman v. Commissioner, supra at 591, is misplaced. Neilan had no such interlocking relationship with Boone as existed in Seaman.↩
15. We also attach no significance to the fact that the results of the Blair Mott core drilling (see p. 7, supra↩) were not specifically mentioned in the Boone offering or in Conaway's reports. While it is true that the core drilling record showed the Peerless seam to measure only 28 1/2 inches in height, as opposed to 34 or 35 inches estimated in the Conaway report, this measurement must be viewed in light of the other six exposures evaluated by Conaway. Conaway's estimate reflected the average of all his measurements, and an average, by definition, will include some measurements above and below the derived figure. Accordingly, given the fact that Conaway had available to him the Blair Mott results when he rendered his study, we decline to second-guess his methods or his final conclusions. Moreover, we note that the core drilling report confirms the seam widths determined by Conaway with respect to the Alma and Cedar Grove seams. 16. We note that Howard testified that, based upon his field investigation, there was no physical evidence that any outcroppings at all were made on the property other than at the mine site itself. However, we are satisfied with petitioner's explanation that the absence of such physical evidence is explained simply by the fact that nine years had passed between the time the exposures were made and Howard undertook his investigation, and that over such time new vegetation took root and nature reclaimed the previously exposed sites. ↩
17. Similarly, we decline to follow the conclusions of respondent's geological expert Marilyn Maisano ("Maisano") that certain conditions existed on the property which suggested that profitable mining on the tract was questionable, and which should have served as "red flags" to a mining engineer that the consistency of the coal seams might be irregular, thus necessitating the making of core drillings to properly estimate the amount of recoverable, proven reserves. While Conaway acknowledged the existence of the property of certain of the conditions listed in Maisano's report, he indicated that such conditions are commonplace to West Virginia mining and opined that they would not impact upon the profitability of the Boone operation, and that Maisano's emphasis on them as determinative of the potential minability of the property was misplaced. Given Conaway's breadth of experience with respect to these particular seams and West Virginia coal in general, and in view of his convincing testimony in response to the findings set forth in Maisano's study, we agree with Conaway that no adverse conclusions should be drawn from the information found in her report.↩
18. The estimated recoverable tonnages in Howard's report were less but nevertheless close to the tonnage estimates contained in the Conaway reports. We are not impressed by Howard's efforts to categorize his estimates as "theoretically recoverable" and to explain such qualification by asserting that he based his estimates, at least in part, on the results derived on the Conaway outcroppings which he claimed were so inadequate. We think it significant that neither Howard nor Maisano conducted any on-site tests of their own (i.e., outcroppings or core drillings) to form a basis for the estimates found in Howard's report. We also note that the projections in the private placement memorandum were based on an assumed production of 1,682,000 tons (2,000 in 1976, 80,000 in 1977 and 200,000 annually thereafter for 8 years). This is approximately 900,000 tons less than the Conaway estimate of 2,597,000 and provides a comfortable cushion for the estimated 515,000 tons in respect of the property as to which title was in dispute. See pp. 11-12, supra.↩
19. Washing, as its name implies, is a process by which lower quality coal is cleaned so that its pollutive effect is reduced thus enabling it to meet enviromental standards. The record reveals that in 1976 the coal to be mined on the Boone property was of sufficient quality, under the standards in effect at that time, that washing was not necessary. While environmental standards became more stringent by 1978 as the effects of the energy crisis subsided, thus necessitating the washing of the Boone coal in order to make it merchantable, see pp. 61-62, infra,↩ in 1976 such washing was not necessary and was therefore properly excluded as a component of cost. 20. At this juncture, we take note that we also heard the testimony of Robert Wolfe of the Kelley, Gidley firm with respect to a preliminary feasibility study concerning the Boone mine which was prepared by that firm in 1978. However, while we have reviewed this report, we conclude that it has little impact on our decision herein because the estimates of cost found therein were based on 1978, not 1976, prices. Similarly, Wolfe's testimony dealt only with mining costs as of 1978. Moreover, the estimates in that report were derived assuming projected tonnages of only 110,000 tons, as compared to the 180,000-200,000 tonnage range assumed by the other experts herein. ↩
21. Aside from transportation, we note that for purposes of our analysis herein we have not, with respect to any of the expert's estimates, included royalties or depreciation amounts in calculating cost per ton. However, it is appropriate to note that royalties and depreciation were taken into account in making the profit projections set forth in the private placement memorandum. ↩
22. We note that Gales testified that the estimated cost per raw ton was actually $ 15.08, plus $ .84 for lease payments on the mine equipment, for a total of $ 15.92. However, he based this estimate on a projected raw tonnage of 231,000 tons. Accordingly, while such an assumption should have no effect on his variable labor cost per ton (estimated at $ 5.19 per ton), it does affect the fixed cost per ton components of his estimate, such as power, equipment and general overhead. As a result, so that the numbers we are comparing herein reflect similar assumptions, we have recalculated the aggregate fixed component of Gales' estimate, ($ 10.73), as if he had used a projected tonnage of 200,000, instead of 231,000, tons, and have arrived at an adjusted fixed cost per raw ton of $ 12.39 ($ 10.73 x 231,000/200,000). Therefore, his total cost per raw ton, as adjusted, is $ 17.58. ↩
23. Howard's report originally estimated the out-of-pocket cost per clean ton to be $ 28.23. However, he acknowledged at trial certain errors in his estimate, which reduced his total by $ 2.61. Moreover, we have removed from his total an additional $ 2.40 he attributed to royalties, as well as $ 1.34 attributed to a five percent contingency factor. Accordingly, $ 28.23 less $ 6.35 leaves us with an adjusted total cost per clean ton, before contingencies, of $ 21.88. ↩
24. We are aware that, on April 1, 1978, Boone (through Hurricane) entered into an hauling agreement with Troy Wheatley ("Wheatley") to truck the Boone coal for a hauling charge of $ 2.35 per ton. However, even aside from the fact that this agreement reflected 1978 and not 1976 costs, the circumstances under which the terms of this agreement were negotiated cause us to disregard the $ 2.35 price as an arm's-length reflection of cost. As Landesman testified at trial, Wheatley was a local landowner who had leased surface rights to his property to the partnership so that the mine road could pass through his land. However, when the mining crew attempted to cross onto his property, Wheatley denied them access and threatened to shoot at them. Accordingly, although Wheatley may not have been within his legal rights, in order to avoid an incident and allow construction of the mine and the road to proceed, Hurricane "agreed" to let Wheatley become its trucker at the "negotiated" price of $ 2.35 per ton. ↩
25. Before making this adjustment, Gales adjusted downward other component costs listed in Howard's report so as to reduce Howard's total to $ 1,743,000. Gales then reduced this figure by $ 907,000, the cost attributable to equipment which could have been leased, and then added back $ 181,400 to reflect the required 20 percent downpayment on this equipment, for a net total of $ 1,107,400. He then added in the purchase for in the report, to arrive at a total capital cost of $ 1,167,400. Based on Gales' and Ball's testimony, we are of the opinion that these reductions were warranted and necessary to adequately reflect the total amount of capitalization. ↩
26. Similarly, we think it logical to assume that the capital necessary to begin mining the Cedar Grove seam would be generated by the cash flow thrown off by proceeds from sale of the Peerless coal. Moreover, we note that the cash flow projections found in the offering memorandum support such assumptions. ↩
27. We assume a 50 percent rate of tax because in 1976, section 1348, since repealed, provided for a maximum rate of tax of 50 percent on "earned income" (generally compensation for personal services), which a review of petitioners' 1976 return reveals comprised the bulk of petitioners' income in that year. See Estate of Baron v. Commissioner,798 F.2d 65, 73 n.8 (2d Cir. 1986), affg. 83 T.C. 542↩ (1984). 28. We note that, even assuming a 70 percent tax bracket, the financial projections indicate a cash flow of $ 31,680 produced by the tax savings and a $ 107,161 cash flow from the deduction of the advance royalty in 1976, which is only slightly more than one-half of the projected cumulative cash flow and net after-tax savings of $ 170,144. ↩
29. Looking at it another way, it appears that, by the end of 1980, a Boone investor would have received in cash an amount in excess, of his $ 50,000 investment ($ 5,064 + 3 x $ 16,675 + $ 55,089). The assumption underlying the projections (see p. 21, supra) indicates that 682,000 tons of coal would be needed to produce this amount of cash return. Furthermore, if we look at the anticipated situation at the end of 1982, an assumed additional 400,000 tons of coal would have been produced an additional $ 33,350 in revenue or a total of $ 88,439 which would present an approximately 80 percent return on the original investment in a little over six years. We think that these results were well within the realm of possibility for the mining operations and indicate still further a bona fide objective for profit even if there were a slippage in production during the stated total time span. Cf. Estate of Baron v. Commissioner,83 T.C. at 557↩. 30. Even if we take into account the financial benefits from the use of the cash represented by the $ 76,544 deduction of the advanced royalty at 7 percent after taxes for ten years, which respondent does not suggest that we do, the projected cash flow of $ 76,210 produced by the net tax benefits ($ 22,629 plus the aforementioned use of the deductiion, $ 76,544 x .70 or $ 53,581). Compare Estate of Baron v. Commissioner, supra at 556-557 n. 40; Torres v. Commissioner,88 T.C. 702, 731 (1987); Taube v. Commissioner,88 T.C. 464, 477 n. 19 (1987). We also note that our analysis of the potential tax benefits has not taken into account the possibility that sums might have been required to be included in petitioners' income in later years either by way of recapture or the application of the tax benefit rule. See note 42, infra.↩
31. We recognize that the partnership had not received a formal title report prior to October 27, 1976, the date the sublease agreement was entered into. We expect, as has been suggested by respondent, that Boone entered into the agreement nonetheless in an effort to grandfather the agreement prior to the change in respondent's regulations, with respect to the treatment of advanced royalty payments, which was to go into effect on October 29, 1976. See pp., 62-63, infra. However, while we recognize the economic risks attendant on entering into a lease without such a report, we do not think that this circumstance alone indicates that Boone did not enter into the venture with a bona fide objective to make a profit. The fact of the matter is that, while Boone might have initially acted in haste in order to get in under the wire prior to issuance of the private placement memorandum on November 26, 1976, a formal title report was received and it was arranged that if the discovered defects in title could not be cured that LJP would compensate Boone by leasing to the partnership the mining rights to the Alma seam (see p. 12, supra↩). Accordingly, in the overall scheme of things, we think the parties' actions bespeak more of individuals interested in preserving the bona fides of a deal, than of individuals whose primary objective was to secure lucrative tax benefits. 32. Although the partnership was not able to enter into a firm contract for the sale of its coal, it did receive a letter of intent from Chafin Coal Co. to purchase the coal for approximately $ 25.00 to $ 27.50 a ton. Although this was not a binding commitment, we think it is indicative of what the partnership could reasonably have expected to receive on the open market for a ton of its coal in 1976. ↩
33. We reject respondent's argument that, because the $ 5,025,000 figure was calculated by LJP and simply agreed to by Neilan, it does not represent a fair market price. The relative inquiry is, given the facts and circumstances as they existed on October 27, 1976, what was a reasonable per ton royalty amount. See Taube v. Commissioner,88 T.C. at 488↩. 34. We note that we have ascribed no significance to the fact that Landesman testified at trial that one of his objectives in pouring the additional $ 500,000 of Madison Resources capital into Boone was in order to get the mining operations underway so as to preserve the partnership's tax deductions and avoid recapture. To begin with, this infusion of new capital took place in 1978 and we think that Landesman's motivations at that time are hardly relevant to answering the question of whether the partnership possessed the requisite profit objective at the time it originally entered into the transaction in 1976. Moreover, we do not think that Landesman's desire to preserve the partnership's tax benefits, given the substantial sum of money that he had already sunk into the mine operations, in and of itself suggests that the venture was not entered into with a bona fide objective to make a profit. ↩
35. We note that under the amended regulation "in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as accrued." Sec. 1.612-3(b)(3), Income Tax Regs. Accordingly, although not an issue in this case, we think at most, it would appear that Boone would have been entitled to deduct as an advanced royalty the $ 10,000 minimum annual royalty provided for in the sublease payment. See p. 10, supra.↩
36. Similarly, we reject respondent's request that we reconsider our decision in Elkins v. Commissioner,81 T.C. 669↩ (1983), in which we concluded that the "party" required to be bound by a mineral lease prior to October 29, 1976, was the partnership and not the individual limited partner. 37. Sec. 1.612-3(b), Income Tax Regs., prior to amendment, provided, in pertinent part, as follows: (b) Advanced Royalties. (1) If the owner of an operating interest in a mineral deposit * * * is required to pay royalties on a specified number of units of such mineral * * * annually whether or not extracted * * * within the year, and may apply any amounts paid on account of units not extracted * * * within the year against the royalty on the mineral * * * thereafter extracted * * * (3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows: (i) As deductions from gross income for the year the advanced royalties are paid or accrued, * * * [Emphasis added.] ↩
38. See also Tallal v. Commissioner,T.C. Memo. 1984-486, affd. 778 F.2d 275↩ (5th Cir. 1985).
39. We also reaffirm our statement in Seaman v. Commisssioner,84 T.C. at 587-588, that "respondent properly revoked [in Rev. Rul. 77-489, 1977-2 C.B. 177] the two revenue rulings [Rev. Rul. 70-20, 1970-1 C.B. 144 and Rev. Rul. 74-214, 1974-1 C.B. 148] that extended coverage of the old regulation to the payment of lump-sum advanced royalties. Wendland v. Commissioner,79 T.C. at 385↩." Hence, petitioners' reliance on these rulings as support for their position is misplaced. 40. Respondent argues that, since the majority of the cash received by LJP was used for purposes not constituting ordinary and necessary business expenses, e.g., to capitalize Boone Resources (through Neilan) or pay for Wickam's capital contribution to Boone, such amounts (estimated by respondent to be $ 1,400,000) are not deductible by the partnership as advanced royalty payments. We disagree. The relative inquiry herein is whether the cash paid by Boone constituted a pre-paid royalty akin to rent for the partnership's right to extract the coal from the western tract. We have determined, based on the totality of the evidence, that the cash paid to LJP constituted just such an expenditure. In making this determination, we think the ultimate use to which LJP put these funds should be determinative (except, of course, in a situation where a diversion of funds might be indicative of sham), in the same way that if we were deciding whether a commercial tenant's pre-paid rent constituted a deductible business expense, how the landlord spent the rent received would generally not be relevant. The focus is properly on the transaction between LJP and Boone, the lessor and lessee, not on subsequent transactions between the lessor and other parties. With respect to respondent's argument that the net effort of the Wickam $ 775,000 capital contribution to Boone was that Boone really only paid $ 750,000 in cash royalties to LJP, we note that Boone's obligation to pay LJP the full $ 1,525,000 was fixed prior to the Wickam contribution, and that the Wickam involvement in Boone only came about because of the partnership's inability to sell all its units. Accordingly, we think for purposes of determining the bona fides of the $ 1,525,000 cash payment, the fact that Wickam, an indirectly related party, invested in Boone is not relevant. ↩
41. Petitioners also did not report their distributive share of the $ 140,000 deduction for accrued interest on the nonrecourse note claimed by Boone on its 1981 partnership return. See p. 33, supra.↩
42. In light of respondent's posture, we do not decide whether petitioners should be required to include in income in 1981 the amounts of the advanced royalty allowed as an amortization deduction (see pp. 67-68, supra) either by way of recapture or under the tax benefit rule of Hillsboro National Bank v. Commissioner,460 U.S. 370 (1983). See also note 44, infra.↩
43. Similarly, since it appears no deduction was claimed in earlier years with respect to this $ 2,500 miscellaneous accrued expense (see pp. 26, 29, supra), Boone need not report any gain on the discharge of this liability. Moreover, as we noted at pp. 33-34, supra,↩ respondent's disallowance of the other deductions claimed on the Boone return in 1976 and 1977 are based solely on his argument that the partnership's activities did not constitute activities entered into profit under sec. 183. Accordingly, in view of our finding of a bona fide profit objective, we hold that Boone is entitled to deduct these amounts. 44. We note that the net effect of our decision, ignoring the interest owed by petitioners on the earlier year deficiencies, is a wash, i.e., on the one hand we have disallowed petitioners' royalty and interest deductions stemming from the nonrecourse note, pursuant to our finding that the note was too speculative and contingent, and at the same time have determined that no gain should be attributed to the the discharge of these accrued liabilities. We think this reflects a proper application of the tax benefit rule. See Hillsboro National Bank v. Commissioner, supra,↩ note 42. *. The checks to GMAC were actually written for $ 458.35 and $ 250.70. The $ 147 figure represents the portion of the two checks which represents a personal expense of petitioners. ↩
*. Of which $ 853.01 represents nonpartnership expenses for the personal benefit of petitioners. ↩
*. Of which $ 2,103.99 represents nonpartnership expenses for the personal benefit of petitioners. ↩
*. The check to GMAC was for $ 666.92, of which $ 147 represents personal expenses of petitioners. ↩
*. Petitioner stipulated that the endorsements on these four checks were forged.↩
*. Republic National Life Insurance Company was one of the insurance companies which dealt with VLA, UWIM and/or GNA. Mr. Storrs Brigham, who in 1977 was the regional group manager for Republic testified and we find that Republic maintained no account at Lloyds Bank in California. Petitoner had no authority to deposit checks issued to Republic into petitioner's bank account. All the endorsements on these checks were forged. ↩
*. The checks comprising this total were unexplained at trial. Mr. Weller, Mr. Mezger and Mr. Blair were all salesmen for either VLA, UWIM or GNA. Petitioner issued checks to these individuals and apparently forged the endorsements and deposited them into his account. ↩